Edward RAY, Plaintiff,

v.

LIBBEY GLASS, INC., Defendant.

No. 3:97CV7072.

United States District Court,
N.D. Ohio,
Western Division.

March 2, 2001.

Edward Ray, Toledo, OH, pro se.

Lafe Edward Tolliver, Toledo, OH, Wendle S. Ramsey, Shaker Heights, OH, for plaintiff.

John J. Siciliano, Shumaker, Loop & Kendrick, Toledo, OH, for Libbey Glass, Inc., defendant.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Defendant Libbey Glass, Inc.'s Motion for Summary Judgment ("Libbey," Doc. No. 44). Plaintiff Edward Ray has filed a response ("Ray," Doc. No. 67), to which Libbey has replied (Doc. No. 70). This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Ray brings this action alleging that he was terminated based on his disability, that his assignment to the position of carton sealer prior to his discharge was discriminatory based upon his race and his sex, and that Libbey's treatment of him prior and subsequent to his injury constitutes intentional and/or negligent infliction of emotional distress. Libbey asserts that Ray's termination was not based on his disability and that his assignment to the carton sealer position was not based on his race or his sex. Rather, Libbey claims Ray was terminated due to a violation of the company's sick leave policy and that he was rescheduled for carton sealer training because he had not previously signed a waiver and because he may not have previously received the requisite amount of carton sealer training.

For the following reasons, Libbey's motion for summary judgment is granted with respect to Ray's state and federal claims based on race and sex discrimination and Ray's claim for negligent or intentional infliction of emotional distress. Libbey's motion for summary judgment is denied with respect to Ray's state and federal claims based on disability discrimination.

## I. Introduction

Ray began working for Libbey, a worldwide manufacturer of glass tableware and ceramic dinnerware, on August 9, 1993. Libbey's facility in Toledo, Ohio manufactures and packages glass tableware products only. The facts surrounding the case at bar are limited to the Select and Pack Department of the Toledo, Ohio facility.

Initially, Ray was hired as a selector in the Select and Pack Department. All hourly Select and Pack Department employees are initially hired as selectors. Selectors are responsible for separating defective glassware, grasping the non-defective glassware from a moving conveyor belt, and packaging the glassware into cardboard boxes. As with all individuals hired in on the call list as selectors, Ray was eventually given the opportunity to train as a carton sealer. It is undisputed that the position of carton sealer offers the following benefits: (1) the carton sealer position is the stepping stone to many positions that a selector would not be eligible to perform under the collective bargaining agreement ("CBA"); (2) an employee qualified as a carton sealer has more opportunities to work and could avoid periodic layoffs due to being able to perform both carton sealer and selector work; and (3) a carton sealer is paid more than a selector. The carton sealer position, however, is more physically demanding than the position of selector.[1]

Due to the physical demands of the carton sealer position, Libbey takes its new employees to the carton sealer area where they are given the opportunity to pick up the boxes to determine if they are willing

---

1. While both positions require rapid movements, a carton sealer must seal, lift, and carry packed boxes of glassware.

and able to perform the carton sealer job. Those employees that are unwilling or unable to perform the work are given the opportunity to disqualify themselves from further training. The parties, however, dispute how an employee is disqualified.

Libbey states that those employees unwilling or unable to perform the carton sealer work are allowed to sign written waivers at the time they are given the opportunity to pick up the boxes in order to avoid being trained for the carton sealer position. Those employees who do not sign a waiver are scheduled for carton sealer training in addition to selector training. Libbey also states that employees may decide during carton sealer training that they are unable or unwilling to perform the job and sign the waiver at that time. Regardless of when an employee decides to become disqualified, Libbey maintains that a waiver must be signed.

Ray has a different understanding of the disqualification process. Ray claims that, as of October 1993, to be disqualified you would merely tell your foreman. He states that he never knew there was a waiver to sign. Ray did not attempt to disqualify himself until after he started training for the carton sealer position. Ray states he went to his foreman who took him to the office foreman, and they asked him to call Skip Whittington ("Whittington"), the Head Supervisor of the Select and Pack Department. Ray claims he received his disqualification from Whittington.

All new employees were initially placed on a "call list" whereby, based upon the needs of the shift coordinator, they would be called individually for work.[2] During Ray's tenure with Libbey, an employee could choose the particular shift and days he or she wanted to work by accepting or rejecting the Shift Coordinator's calls. Employees could also accept or reject particular positions in the same manner so long as employees worked the requisite number of hours per week in some capacity.

Ray received carton sealer training in October of 1993. Ray claims he trained for less than a week before disqualifying himself. After this initial training, Ray worked as a selector until he was rescheduled for carton sealer training in August of 1994. Libbey asserts that Ray was retrained because he had not previously signed a waiver and because he may not have received the requisite amount of time for carton sealer training in October of 1993.[3] Ray states he complained to his foreman about being rescheduled for carton sealer training. In addition, he claims he went to the office Shift Coordinator after learning he was being rescheduled for carton sealer training. Ray's complaints, however, were not reduced to writing until June 30, 1995.[4]

2. At all times relevant to this litigation, Libbey used a call list to assign employees to positions and shifts. The call list provides the Shift Coordinator with the name of the employees and the position(s) (*i.e.,* selector and/or carton sealer) for which each employee is qualified. The Shift Coordinator determines the job assignments. The Shift Coordinator would then go down the list and call the employees until the available positions for that shift were filled. The employee could choose a position from among those available. The employee could also choose not to work if he/she did not want to work in any of the available positions. The employee could also choose the shift to work because the Shift Coordinator for each shift would go through this same process. If an employee refused a first shift position, the employee's name would go on the list given to the Shift Coordinator for the second shift. This method of assignment applied to hourly employees only.

3. While Libbey disputes in its motion for summary judgment that Ray was ever orally disqualified by Whittington, the Court notes that Libbey admits in its answer that Ray waived out of the carton sealer position in October of 1993. (Def.'s Answer, at ¶ 14.)

4. On June 30, 1995, Ray submitted a letter to Donald Dudley, the Union President, which explained the injuries he sustained and the circumstances surrounding the injury. According to Ray, he wanted the Union to file a grievance on his behalf.

Following the second period of training, Ray was qualified to work as both selector and carton sealer. Ray worked both positions without incident until February 9, 1995. On February 9, 1995, Ray was working the carton sealer position and had been having trouble with the shrink wrapper/carton sealing machine, which kept breaking down. Eventually Ray was shown how to repair the machine and was attempting to repair it when the machine came down on Ray's hand. Ray could not remove his hand and sustained severe burns to it.

Following his injury, Ray was sent to Dr. Sippo, Libbey's company doctor, who, in turn, referred him to Dr. Michael Yanik, a plastic surgeon. Ray, however, continued working as a selector/carton sealer until March 2, 1995, when he underwent surgery with Dr. Yanik who performed a skin graft on Ray's wrist.[5] Following surgery, Ray was off work for over two weeks. Dr. Yanik released Ray to return to "light duty" on March 20, 1995 with regular duty commencing on March 27, 1995. During this time, Ray received workers' compensation benefits.

Libbey has in place a sick leave policy whereby employees submit to Libbey a written doctor's note, referred to as an "off work slip," in order to be off on sick leave. The first slip presented to Libbey on behalf of Ray came from Dr. Yanik. This release placed Ray off work until March 27, 1995.[6] While off work following his surgery, Ray went to see Dr. Philip Stiff because he was experiencing chest pain.[7] Dr. Stiff diagnosed the problem as agitat-

ed depression and chest wall pain and gave Ray an off work slip beginning March 17, 1995 through March 27, 1995. Dr. Stiff extended Ray's sick leave through March 31, 1995 and an off work slip was provided to Libbey. Dr. Stiff again extended this time until April 3, 1995 and had Ray returning to work as a selector.[8] Libbey, however, could not accommodate this request.

According to Pam Puterbaugh ("Puterbaugh"), Libbey's Workers' Compensation Coordinator, Ray could only return to work as a carton sealer. Ray's sick leaves from Dr. Stiff were not treated as workers' compensation leaves; rather, they were treated as medical leaves. According to Puterbaugh, a medical leave, unlike a workers' compensation leave, requires employees to return to their regular job, full duty, with no restrictions. According to Puterbaugh, if this cannot be done, they remain on sick leave. If Ray had been on a workers' compensation leave, he could return with restrictions if they relate to the allowed condition in the claim. Ray was initially on a workers' compensation leave following the surgery by Dr. Yanik on his wrist. Once Ray went to see Dr. Stiff, Libbey no longer treated it as workers' compensation leave and, instead, treated it as medical leave. Accordingly, Ray was unable to return as a selector.

Dr. Stiff provided another extension of Ray's leave beginning April 3 through April 14, 1995. Dr. Stiff released Ray to return to work on April 17, 1995 with no restrictions. Ray then returned to work in the position of selector/sealer.[9] Ray, how-

---

5. The Court is unclear as to whether Ray was able to work only as a selector or whether he worked both positions during this time period.

6. Although Dr. Yanik released Ray for light duty beginning on March 20, 1995, Libbey was unable to accommodate him because there was no light duty position available. Accordingly, Ray remained off work until March 27, 1995.

7. Ray's first appointment with Dr. Stiff took place on March 3, 1995.

8. The off work slip stated that Ray could return to work on April 3, 1995 as a selector. Dr. Stiff also noted that rapid movement may exaggerate Ray's chest wall pain.

9. Although it is unclear which position Ray worked, it appears that Ray worked third shift and had to stop working because he experienced chest pain again.

ever, only worked two days, then brought in an off work slip from Dr. Stiff beginning on April 22 and running through May 3, 1995. The condition cited on the slip was costochondritis. Again, this leave was treated as medical leave by Libbey.

Ray then sought a second opinion for his chest pain from Dr. Wilson Felix, a cardiologist. Ray's first appointment with Dr. Felix was on April 27, 1995. Dr. Felix diagnosed Ray's chest pain as mitral valve prolapse. Ray's leave was then extended through May 18, 1995, and Libbey was given an off work slip. Dr. Felix subsequently extended this leave through August 21, 1995. On June 9, 1995, however, Ray presented Libbey with a return to work slip beginning June 12, 1995. The only restriction Ray had was that he could only work first or second shift. Again, Puterbaugh determined that this request could not be accommodated. According to Puterbaugh, because Ray's leave was still classified as medical, it would have been a violation of the CBA to place him on one of these shifts permanently. Ray then submitted a total of four more off work slips— two from Dr. Munir Ahmad and two from Dr. Edna Jean.

Dr. Ahmad's leave covered the period from August 25 through September 25, 1995. The reason cited for the leave was mitral valve prolapse and depression. On September 25, 1995, Ray went to see Dr. Jean for a foot injury. Dr. Jean placed Ray on leave from September 25 through October 2, 1995 for treatment of his left foot.[10] This leave was subsequently extended to October 10, 1995. Finally, Dr. Ahmad extended Ray's leave from October 13 through November 16, 1995.

According to Ray, he had a doctor's appointment with Dr. Felix on November 16, 1995, but, due to an emergency, Dr. Felix could not make the appointment. Ray states he called Puterbaugh to explain the situation and she told him to remain off until his next appointment because he had a restriction and could not return to work. Puterbaugh, however, denies that Ray contacted her or that she gave such instructions.

Ray did not return to work on November 16, 1995 or submit an off work slip. As a result, Ray's employment was terminated on November 30, 1995. The reason given by Libbey for Ray's termination was his violation of the sick leave policy. Puterbaugh submits that had Ray continued to provide Libbey with appropriate documentation extending his sick leave, he could have remained an employee for up to three more years.

According to Libbey, Ray applied for and received workers' compensation benefits for the time he missed as a result of the wrist injury and the subsequent skin graft. From March 20, 1995 through September 22, 1995, Ray received short-term disability benefits under the CBA.[11] On September 21, 1995, Ray filed an amendment to his February 9, 1995 workers' compensation wrist injury claim seeking to collect temporary total workers' compensation benefits. Rays asserts that his depression and chest pains were related to and arose out of the injury to his wrist and, as a result, should have been treated as an injury covered by workers' compensation. This request, however, was denied. As of September 22, 1995, Ray received no compensation. This led Ray to file for unemployment compensation on

---

**10.** According to Ray, he had a toenail removed as a result of an injury sustained at work. The injury allegedly occurred in August of 1994, but it was not reported to Libbey until almost a year later.

**11.** Ray was placed on leave until March 27, 1995. Although he was released for light duty on March 20, 1995, Libbey could not accommodate this request. Accordingly, the

Court is unclear as to why Ray did not receive workers' compensation benefits through March 27, 1995. This would have enabled Ray to receive short-term disability beginning March 27, 1995 and running through September 29, 1995. The resolution of this issue, however, does not affect the Court's ruling on the motion at issue.

November 27, 1995. Ray states he made this decision based on advice he received from the Union President, Donald Dudley.

Ray claims that, as a result of his wrist injury and subsequent depression and chest pains, he is totally disabled and unable to perform any work—at Libbey or otherwise.[12] On December 18, 1995, Ray filed a charge with the Ohio Civil Rights Commission ("OCRC") alleging that he was disabled and was terminated because of his disability. On October 11, 1996, the OCRC issued a dismissal of the charge indicating that there was no probable cause that any discrimination occurred and that Ray was discharged because he failed to return to work from sick leave in accordance with Libbey's written policy. The Union filed a grievance on Ray's behalf, but it subsequently declined to arbitrate the grievance due to Ray's violation of the sick leave policy. In addition to this suit, Ray filed a hybrid § 301/breach of duty of fair representation action with this Court against Libbey and the Union, but that suit has been dismissed.

## II. Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In applying Rule 56(c), the Court is to view the evidence in the light most favorable to the nonmoving party and determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. Discussion

### A. Disability Discrimination

Libbey moves this Court for summary judgment on Ray's claims of disability discrimination under both the Americans with Disabilities Act ("ADA") and Ohio Revised Code § 4112.01 *et seq.* For purposes of summary judgment, the analysis of both the federal and state disability claims will be based on federal case law interpreting Title VII of the Civil Rights Act. *See Little Forest Med. Ctr. v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 609–10, 575 N.E.2d 1164 (1991).

Libbey raises, as a threshold matter, the argument that Ray's state law disability claim suffers from a fatal procedural flaw. Libbey argues that because Ray previously brought a handicap discrimination charge before the OCRC, which issued a "no probable cause" ruling, he is forever barred from bringing that claim in a separate civil action. Ray's response to this argument is limited to one sentence: "[T]he argument that Mr. Ray's claim suffers from a procedural flaw because he has brought his claim before federal court as opposed to state court is without merit." (Pl.'s Mem. Opp'n, at p. 13).

Essentially, Libbey takes the position that Ray could have appealed the OCRC's no probable cause ruling to common pleas court pursuant to O.R.C. § 4112.06. By filing a separate civil action, Libbey argues that Ray is barred from raising discrimination claims under Ohio law in this federal suit. This election of remedies argument, however, is limited to age discrimination cases. *See Bourquin v. KeyBank, N.A.*, 138 Ohio App.3d 435, 741 N.E.2d 584

---

**12.** The Court is unclear, based on discrepancies within Ray's deposition testimony and filings Ray made subsequent to sustaining his injury, as to whether Ray claims he is *tempo-* *rarily* or *permanently* totally disabled from performing *any* position, or whether Ray is *permanently totally* disabled from performing only the position of carton sealer.

(1992) (stating that there is no election of remedies for other discrimination categories discussed in Title 41 Chapter 12— including race and disability). Had this been an age discrimination case, because Ray filed a charge with the OCRC, he would have had to make clear that the charge filed with the OCRC was for the sole purpose of perfecting an Age Discrimination in Employment Act ("ADEA") claim. *See Baker v. Siemens Energy & Automation, Inc.,* 838 F.Supp. 1227, 1233–34 (S.D.Ohio 1993); *Woods v. Vermilion Local Sch. Dist.,* No. 3:98CV7462, 1999 WL 652019, at * 5 (N.D.Ohio Aug.9, 1999). However, because this case is based on alleged disability discrimination, there is no election of remedies and Ray's state law claims are not barred.

■ Under the ADA, it is unlawful for an employer to discriminate against a qualified individual with a disability in the terms and conditions of employment based on that individual's disability. 42 U.S.C. § 12112(a). In order to fall under the protection of the ADA, a plaintiff must demonstrate that he is a "qualified individual with a disability," which is defined under the statute as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To establish a valid disability discrimination claim, Ray must prove all of the following: (1) that he is disabled within the meaning of the American with Disabilities Act ("ADA"); (2) that he is "otherwise qualified" to perform the job in question, either with or without reasonable accommodation; and (3) that Libbey "either refused to make a reasonable accommodation" for the disability, or that Libbey discharged Ray solely because of his disability. *Smith v. Ameritech,* 129 F.3d 857, 866 (6th Cir.1997); *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1178 (6th Cir.1996). Libbey moves this Court for summary judgment on the grounds that Ray is not "otherwise quali-

fied," either with or without reasonable qualifications, that it made no adverse employment decision based solely on Ray's disability, and that no objectively reasonable accommodations were proposed.

■ First, Libbey argues that Ray is not otherwise qualified, either with or without reasonable accommodations. Libbey states that Ray has repeatedly admitted in this action and several administrative proceedings that he was and is totally disabled from performing *any* work for Libbey. As a result, Libbey argues that Ray is judicially estopped from claiming that he was otherwise qualified for his position at Libbey. The Court, however, does not view the evidence as clear cut.

While it is apparent that, at times, Ray has claimed he is totally disabled, it is not clear whether his total disability was of a permanent or temporary nature. In addition, there is ambiguity as to whether such total disability was limited to any carton sealer position, or whether he also was disabled from performing the work of a selector. The administrative proceedings in which Ray asserted that he is totally disabled occurred following Libbey's denials of Ray's proposed accommodations based, at least in part, on the argument that Ray could only return to the position of carton sealer. Accordingly, Ray's statements could be interpreted to mean that he was totally disabled from performing any carton sealer position. Although evidence of these admissions on the part of Ray will pose difficulties in proving that he was otherwise qualified, the Court is not inclined to find that Ray is judicially estopped from presenting his evidence.

The remaining element Ray must prove to establish a valid claim of disability discrimination is that Libbey either refused to make a reasonable accommodation for the disability or that Libbey discharged him solely because of his disability. Libbey begins with the argument that Ray cannot prove that it discharged him solely because of his disability. Based on the fact that Ray violated the written sick

leave policy, the Court agrees that, as a matter of law, such a showing cannot be made. However, Ray can prevail if he shows that Libbey refused to make a reasonable accommodation for his disability. Libbey argues that no objectively reasonable accommodation was proposed.

■ In this case, Ray bears the initial burden of showing that a reasonable accommodation is possible. If he does this, Libbey then will be given an opportunity to persuade the fact finder that the proposed accommodation imposes an undue hardship. *Monette*, 90 F.3d at 1183–84, n. 10. Ray proposed three accommodations—all of which were denied by Libbey. First, Dr. Stiff, in extending Ray's leave until April 3, 1995, stated Ray could then return to work as a selector. In addition, Dr. Stiff noted that rapid movement may exaggerate chest pain. Libbey denied this accommodation based on its position that Ray could only return to the last position held, which it stated was carton sealer. The reason for its stance was that Ray's extended leave was for his chest pain—a medical condition not related to his workers' compensation injury.

There are a number of factual disputes, which make resolution of this issue by summary judgment inappropriate. First, Puterbaugh's affidavit of February 29, 1996 states that, after suffering his injury on February 9, 1995, Ray waived off the position of carton sealer and was on the selector call in list only. This statement is in direct conflict with Libbey's position in its motion for summary judgment that Ray's last position was that of carton sealer. Second, it is unclear whether Ray's chest pain was a result of or related to his work-related injury. In a letter from Dr. Gordon Todd to Aetna Life Insurance Company, Dr. Todd stated that Ray "told the doctors [while on temporary disability from work due to his wrist injury] that he

had been having chest pain in the left anterior chest since December, 1994."[13] (Puterbaugh depo., at Ex. L.) During his deposition, however, Ray claims that the chest pain occurred as a result of the trauma experienced with the wrist injury. Accordingly, the evidence is unclear as to whether the trauma caused the chest pain or whether the trauma worsened Ray's pre-existing condition.[14]

The second accommodation was proposed by Dr. Todd on May 30, 1995. Dr. Todd stated that Ray could return to Libbey doing work with lighter and less repetitive and rapid movement requirements. Libbey also denied this accommodation. According to Puterbaugh, granting this accommodation would violate the CBA because there was no employment of this type available for which Ray was qualified, in terms of seniority, to perform.

The final accommodation proposed by Ray and denied by Libbey was that Ray work first or second shift only. Although Ray could choose his shift by virtue of how the call list system functioned, Libbey denied this accommodation on the grounds that such an accommodation would be a promotion. According to Libbey, because Ray was a call list employee, placing him on the first shift schedule would have required moving him to the position of a schedule employee resulting in a promotion. Libbey argues promoting Ray in this manner would violate the CBA.

The existence of these material factual disputes makes summary judgment on Ray's disability discrimination claims inappropriate. The Court has set forth in great detail the parties' arguments in an attempt to reveal the complexities of these claims. The evidence relied upon by both Ray and Libbey appear, at this point, to be contradicted by evidence provided by their own witnesses—whether at the hands of Puterbaugh in the case of Libbey or Ray

---

**13.** Aetna requested that Ray be evaluated by Dr. Todd. This examination took place on May 30, 1995.

**14.** It also could be the case that the chest pain, even if a pre-existing condition, was the result of the work Ray performed at Libbey.

himself. Regardless, it is evident to the Court that presenting the evidence to the jury in a clear and organized manner presents a daunting task for both Ray and Libbey. In light of the foregoing, Libbey's motion for summary judgment on Ray's disability discriminations claims is denied.

## B. Race Discrimination

■ It is well-established that the burden is on an employment discrimination plaintiff to establish a prima facie case of discrimination. The four-part test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is applicable to claims brought under Title VII, ADEA, Ohio state law, and 42 U.S.C. § 1981. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992) (internal citations omitted). Ray contends that he was discriminated against by being rescheduled for the carton sealer position. More particularly, Ray claims he was disqualified from the position of carton sealer, yet was forced to go through the training. Accordingly, to establish a prima facie claim of disparate treatment, Ray must produce evidence which, at a minimum, establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees. *Mitchell,* 964 F.2d, at 582–83. The parties do not dispute that Ray, an African–American male, is a member of a protected class. Accordingly, the Court will focus its analysis on the second element.

■ To support his claim of racial discrimination based on disparate treatment, Ray asserts that no white employees were rescheduled for carton sealer training after having disqualified. This broad assertion, however, does not satisfy the second element because the employees Ray is comparing himself to are not similarly-situat-

ed. "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects.*" *Mitchell,* 964 F.2d, at 583 (citing *Stotts v. Memphis Fire Dept.,* 858 F.2d 289 (6th Cir.1988)) (emphasis in original). This requires that the individuals with whom Ray is comparing his treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct. This, however, is not the case.

Ray does not dispute that he never signed a waiver to disqualify himself from carton sealer training as required by company policy. Rather, Ray states he went to the floor foreman who took him to the office foreman, Karen Henegar, who told Ray to call Skip Whittington, the department head. According to Ray, it was Whittington who disqualified him orally.[15] The non-minority employees with whom Ray compares himself were disqualified by signing waivers. The Court finds that the difference in the procedures used by Ray and the non-minority employees to disqualify from carton sealer training is significant. By signing a waiver, the non-minority employees have created a record of their disqualification, which could protect them from being rescheduled for this training. Regardless, because Ray failed to produce sufficient affirmative evidence to establish that the non-minority employees with whom he compares his treatment were "similarly situated in all respects," no claim for discrimination can be based upon a comparison of Ray's and their treatment. Accordingly, Libbey's motion for summary judgment on Ray's race discrimination claims under Title VII, Ohio state law, and 42 U.S.C. § 1981 based on disparate treatment is granted.

---

**15.** The Court notes that neither Henegar nor Whittington had any recollection of Ray being disqualified orally by Whittington.

## C. Sex Discrimination

█ The basis for Ray's sex discrimination claim is the same as with his race discrimination claim—that he was rescheduled for carton sealer training after having disqualified. Ray's claim for sex discrimination, however, is really a claim of reverse discrimination given that Ray is male.[16] To make out a prima facie case of reverse ·discrimination, Ray must show that: (1) background circumstances support the suspicion that Libbey is that unusual employer who discriminates against the majority; and (2) Libbey treated him differently than other similarly situated employees who were not members of the protected group. *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir.1985).

█ Ray states that, in terms of disqualifying out of the position of carton sealer, being a woman is a favored status due to the difficulty of the physical labor involved. In addition, Ray stated in his deposition that no women were forced to undergo carton sealer training after having disqualified. Even assuming that these statements are accurate, Ray fails to establish a prima facie case of reverse discrimination. Ray has failed to provide any evidence establishing that Libbey discriminates against the majority or that Libbey treats its male employees differently. In fact, the evidence establishes that any employee could sign a waiver to disqualify from carton sealer training for any reason. Legitimate reasons for disqualification were not limited to situations where the employee was physically unable to perform the task. Rather, employees could disqualify even if they simply did not like the job—regardless of whether or not they could perform the tasks. Accordingly, Libbey is entitled to summary judgment on Ray's claims of sex discrimination.

**16.** Ray does not agree that this ·is a claim of reverse discrimination. Rather, he states his claim should be analyzed using the *McDonnell Douglas* analysis because being a woman is the favored status in terms of the carton sealer position because this position is physi-

## D. Negligent/Intentional Infliction of Emotional Distress

█ As a threshold matter, the Court notes that Ohio courts do not recognize a separate tort for negligent infliction of emotional distress in the employment context. *Hatlestad v. Consolidated Rail Corp.*, 75 Ohio App.3d 184, 191, 598 N.E.2d 1302 (1991) (citing *Antalis v. Ohio Dept. of Commerce*, 68 Ohio App.3d 650, 589 N.E.2d 429 (1990)). Therefore, to the extent Ray attempts to assert such a claim, Libbey is entitled to summary judgment and the same shall be granted.

█ Ray's claim for intentional infliction of emotional distress is based on the manner in which he was treated by Libbey and, in particular, Puterbaugh. In order to establish a claim of intentional infliction of emotional distress under Ohio law, a plaintiff must prove four elements:

1) that defendants either intended to cause emotional distress or knew or should have known that their actions would result in serious emotional distress to the plaintiff;

2) that defendants' conduct was extreme and outrageous;

3) that defendants' actions were the proximate cause of plaintiff's psychic injury; and

4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Pyle v. Pyle*, 11 Ohio App.3d 31, 34, 463 N.E.2d 98 (1983). The Ohio Supreme Court that first recognized the tort of infliction of emotional distress found instructive comment *d* to Section 46 of the Restatement of Torts (Second) in regard to the "extreme and outrageous" standard:

cally demanding. The Court disagrees with this argument because *any* employee could sign a waiver *any* reason. Accordingly, the Court treats his claim as one of reverse discrimination.

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Yeager v. Local Union 20,* 6 Ohio St.3d 369, 374–75, 453 N.E.2d 666 (1983).

Nothing in the facts of this case suggest any intentional infliction of emotional distress under the standard articulated above. Accordingly, Libbey's motion for summary judgment on this claim is granted.

### IV. Conclusion

Based on the foregoing, Libbey's motion for summary judgment on Ray's claims for race discrimination, sex discrimination, and negligent or intentional infliction of emotional distress is granted. Libbey's motion for summary judgment on Ray's claims for disability discrimination is denied. The Court will conduct a telephone status conference on April 2, 2001 at 3:00 p.m.

IT SO ORDERED.