770 F.2d 63
 38 Fair Empl.Prac.Cas. 1065,
37 Empl. Prac. Dec. P 35,447
Kansas E. MURRAY, Plaintiff-Appellant,
v.
THISTLEDOWN RACING CLUB, INC.; Randall Racing Club, Inc.;
Summit Racing Club, Inc.; Cranwood Racing Club,
Inc., Defendants-Appellees.
 No. 84-3075.
 United States Court of Appeals,
Sixth Circuit.
 Aug. 12, 1985.
 
 Charles R. Laurie, Laurie, Hull, Ryan and Doyle, Cleveland, Ohio, for plaintiff-appellant.
 John B. Lewis, Cleveland, Ohio, for defendants-appellees.
 Before KEITH and JONES, Circuit Judges, and NEWBLATT*, District Judge.
 KEITH, Circuit Judge.
 
 
 1
 The plaintiff, Kansas E. Murray, appeals from an order granting summary judgment entered by the United States District Court for the Northern District of Ohio on December 20, 1983. Murray, a white female, instituted this "reverse discrimination" action against her former employers, the Thistledown Racing Club, Inc., Randall Racing Club, Inc., Summit Racing Club, Inc. and Cranwood Racing Club, Inc. (defendants) in February of 1982. Murray claimed she was constructively discharged from her job because of her race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e et seq.[1] and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. Sec. 1981.[2] On appeal, Murray contends that summary judgment was improper because there were disputed issues of material fact. We do not agree. For the reasons set forth below, the judgment of the district court is affirmed.
 
 FACTS
 
 2
 The facts of this case are fully set forth in the district court opinion, Murray v. Thistledown Racing Club, 603 F.Supp. 479 (N.D.Ohio 1983):The relevant and material facts are not disputed. Kansas Murray is a white female who worked as a mutuel clerk for the Racetrack, which conducts horse racing activities at Thistledown Race Track. ("Thistledown"). During the 1979 racing season, Murray accumulated a total of $31,302.00 in shortages. In 1980, she aggregated $29,501.00 in shortages, more than any other mutuel clerk at the track. Just before Murray was to begin work in 1981, the Racetrack insisted that she sign the following statement:
 
 
 3
 I __________ do hereby acknowledge that __________ of Thistledown management has formally advised me that after having been previously notified and warned of chronic shortages in my position as mutuel clerk, that any further shortages will clearly define incompetence to be so employed; and such shortages will result in my immediate dismissal from Thistledown Race Track.
 
 
 4
 She refused and has not worked at the Racetrack since. Murray contends that the Racetrack's actions constituted a constructive discharge impermissibly based on race. The Racetrack employs approximately 170 mutuel clerks during the week and about 200 on the weekends. Most of the mutuel clerks are white.
 
 
 5
 Mutuel clerks are assigned certain positions: seller, cashier, messenger (or "runner") and ticket counter. A seller's duties include taking bets from customers and insuring that the amount of money collected balances with the number of mutuel tickets sold. Cashiers are responsible for cashing winning tickets and balancing the number of tickets cashed with the amount of money paid out by the cashier. A messenger's duties include delivering money to cashiers as needed and taking the cashier's cashed tickets to the ticket room. Ticket counters are responsible for balancing the cashier's count of tickets with the actual number of tickets cashed.
 
 
 6
 All mutuel clerks are financially responsible for their own proven shortages, according to the terms of the collective bargaining agreement between the Racetrack and mutuel clerks' union (Racing Guild of Ohio, Local No. 304). The Racetrack's rules governing shortages provide in pertinent part:
 
 
 7
 18. Shortages will be subject for a warning and continued shortages could result in suspension and/or dismissal. Shortages MUST be paid the next day before beginning to work.
 
 
 8
 Kansas Murray's highest shortages occurred when she was working as a seller, collecting money from the persons placing bets. In the last two months that she spent as a seller during the 1980 season, there were six separate occasions on which Murray had shortages of over $1,000 each. ($1,777 on September 5; $1,810 on September 14; $1,498 on September 19; $1,265 on September 21; $1,050 on September 28; and $1,957 on November 1, 1980). Murray was always able to repay her shortages before beginning work the next day, as required by the Racetrack's rules. However, after her last and highest ever shortage on November 1, 1980 (a Saturday night) Murray told Garvin Wright, Assistant General Manager and Director of Mutuels at Thistledown, that she would be unable to pay the $1,900 shortage in time to work the following day and that she would have to travel to Indiana to get the money. She asked if Wright would allow her to work Sunday without first repaying her shortage. Wright denied her request and Murray did not pay her shortage until the following Thursday or Friday. She was not permitted to work during the interim (Deposition of Kansas Murray at pp. 47-50).
 
 
 9
 When she next reported to work, Murray was not returned to the seller's window, but was instead assigned a non-money handling job as a runner. She finished the season as a runner, and did not incur further shortages.
 
 
 10
 At the beginning of the 1981 season, Murray reported for work and was returned to a money-handling position. Midway through her first day on the job, Murray was called to Wright's office and told that, because of her history of chronic shortages, she would have to sign a statement acknowledging that she had been warned about her shortage problem and that she recognized that she could be terminated for future shortages. Murray was not terminated; she was merely given a choice between complying with Racetrack policy or forfeiting her right to continue working. Murray chose not to sign the statement and left the track. She has not returned to work at the Racetrack.
 
 
 11
 Instead, she filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC"), alleging that she was discriminated against on the basis of race because the Racetrack asked her to sign the statement, but did not impose the same requirement on four black mutuel clerks who also had shortages. Both commissions found against Murray and the EEOC issued a Right to Sue letter. Murray then filed the instant suit under Title VII and 42 U.S.C. Sec. 1981, alleging the same cause of action.
 
 
 12
 Murray contends that the Racetrack treated her more harshly than the four black mutuel clerks because the Racetrack feared that the black clerks would claim they were targets of discrimination.
 
 
 13
 The Racetrack contends that it presented Murray with the shortage statement because she had a continuing history of large shortages, far greater than those of the four black mutuel clerks. Murray's shortages were the worst that Wright, Director of Mutuel Clerks, had seen in his thirty-five years at the track.
 
 
 14
 The four black clerks to which Murray compares herself were also removed from money handling positions during the holiday months of November and December of 1980, but there the similarity ends. The four black clerks' individual shortages for the year totaled $9,021; $9,190; $11,265; and $16,888, respectively: Kansas Murray's shortages totalled $29,501.
 
 
 15
 603 F.Supp. at 481-82 (footnotes omitted). In considering the defendants' motion for summary judgment, the district court found that Murray had failed to establish (1) a prima facie case of "reverse discrimination" under Title VII, (2) genuine issues of material fact, and (3) a prima facie case under Section 1981. The court thereupon granted the defendants' motion for summary judgment and dismissed the action with prejudice.
 
 DISCUSSION
 
 16
 Our review of an order granting summary judgment focuses on whether genuine issues of material fact preclude dismissal of the case. Fitzke v. Shappell, 468 F.2d 1072, 1077 (6th Cir.1972). See Fed.R.Civ.P. 56(c). The determination of summary judgment in this case requires evaluation of the initial proof submitted for Murray's "reverse discrimination", disparate treatment claim under Title VII and the related proof of intentional discrimination required under Section 1981.
 
 I.
 TITLE VII
 
 17
 A. Prima Facie Case of Reverse Discrimination
 
 
 18
 The general standard for establishing a prima facie case in disparate treatment cases under Title VII is set forth in the seminal racial discrimination in hiring case, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973):
 
 
 19
 The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 20
 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). As the Court noted, this standard provides an analytical framework which should be modified to accommodate different employment discrimination contexts. Id. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Thus, courts have modified the McDonnell Douglas standard to address disparate treatment cases involving all discrimination prohibited by the Act in promotion, firing, compensation or other conditions of employment.
 
 
 21
 Accordingly, the district court in the case at bar adopted a McDonnell Douglas standard modified to address "reverse discrimination" claims under the Act:
 
 
 22
 In reverse discrimination cases, the first prong of the McDonnell Douglas standard has been interpreted to allow a majority plaintiff to establish a prima facie case of intentionally disparate treatment when "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." Parker v. Baltimore and Ohio Railroad, 652 F.2d 1012, 1017 (D.C.Cir.1981). The remaining elements of the test are modified to reflect the requirement that the plaintiff demonstrate he was treated differently than other similarly situated employees who were not members of the protected group.
 
 
 23
 Murray v. Thistledown Racing Club, Inc., 603 F.Supp. at 483. The court determined that Murray's initial proof was insufficient to demonstrate either background circumstances or racially discriminatory disparate treatment. The district court held that since Murray's prima facie proof had failed to establish a rebuttable presumption of racial discrimination or genuine issues of material fact, the defendants were entitled to summary judgment. We agree. The premise underlying the varied McDonnell Douglas standards remains unchanged. It stems from Congressional efforts to address this nation's history of discrimination against racial minorities, a legacy of racism so entrenched that we presume acts, otherwise unexplained, embody its effect. Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); Parker v. Baltimore and Ohio Railroad Co., 652 F.2d 1012, 1017 (D.C.Cir.1981). As stated by the McDonnell Douglas Court, the primary purpose of Title VII is "to assure equality of employment opportunities and to eliminate those discriminating practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." 411 U.S. at 800,, 93 S.Ct. at 1823.
 
 
 24
 Title VII, of course, prohibits racial discrimination against all groups. McDonald v. Santa Fe Trail Transportation Company, 427 U.S. 273, 276, 279, 96 S.Ct. 2574, 2576, 2578, 49 L.Ed.2d 493 (1976). As with the minority plaintiff, the majority plaintiff who asserts a claim of racial discrimination in employment does so within the historical context of the Act. "Reverse discrimination" claims require application of a McDonnell Douglas standard modified to reflect this context as well as the factual situation of the claim.
 
 
 25
 In our view, the "reverse discrimination" complainant bears the burden of demonstrating that he was intentionally discriminated against "despite his majority status." Lanphear v. Prokop, 703 F.2d 1311, 1315 (D.C.Cir.1983) (quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.d 207 (1981)). We agree with the district court that a prima facie case of "reverse discrimination" is established upon a showing that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority," Parker v. Baltimore and Ohio Railroad Co., 652 F.2d at 1017, see also Daye v. Harris, 655 F.2d 258 (D.C.Cir.1981); and upon a showing that the employer treated differently employees who were similarly situated but not members of the protected group. See id; see also Bundy v. Jackson, 641 F.2d 934, 951 (D.C.Cir.1981).
 
 
 26
 i. Background Circumstances
 
 
 27
 We find no error in the district court conclusion that Murray failed to establish a prima facie case of "reverse discrimination". The court first noted that Murray proffered no background circumstances suggesting the defendants are the unusual employers who discriminate against the majority: "To the contrary, it is undisputed that the majority of mutuel clerks at the track were white. Neither does Murray even hint that practices grounded in an affirmative action program are at issue here. Clearly, she has not met the first prong imposed for establishing a prima facie case." 603 F.Supp. at 483 (footnote omitted).
 
 
 28
 ii. Different Treatment
 
 
 29
 Next, the district court addressed the question of whether, notwithstanding the absence of background circumstances, discrimination was evident from the defendants' different treatment of black mutuel clerks who allegedly incurred similar shortages but were not required to sign a statement. The district court found two factors which differentiated Murray from the black mutuel clerks: Murray's persistent record of large shortages and risk created to the employer by her last shortage.
 
 
 30
 Kansas Murray's attempt to compare herself to the four black mutuel clerks fails when the relevant facts are examined. She had the largest and most frequent cash shortages among the five clerks for both the 1979 and 1980 racing seasons. Her individual shortages in 1980 exceeded the combined shortages of three of the black mutuel clerks and almost doubled the shortages of the clerk with the second highest shortages in the group. This was virtually a replay of the 1979 season, when her total shortages exceeded the combined shortages of three of her black co-workers and doubled the shortages of the black clerk who incurred the second highest shortages.
 
 
 31
 * * *
 
 
 32
 * * *
 
 
 33
 Moreover, the circumstances surrounding Murray's last shortage set her apart from the other mutuel clerks. On a Saturday night, Murray incurred the largest single shortage in the history of her employment. She was nearly $2,000 short. She was unable to repay the shortage before she was to begin work the next day, as required, so she was suspended from work. In explaining her inability to pay promptly, Murray said she would have to travel out of state to obtain the money. Clearly, these facts indicate that not only did Murray incur enormous shortages, she also subjected the Racetrack to the very real risk of never recovering this substantial shortage. The circumstances put her in a disciplinary category unparalleled by any facts established regarding the black mutuel clerks.
 
 
 34
 603 F.Supp. at 484. We agree that these factors render Murray dissimilar from the black clerks with whom she seeks comparison. Murray's shortages were unprecedented and clearly justified the defendants' requirement that she sign the shortages letter not required of clerks with less substantial losses. The district Court was correct in determining that Murray failed to establish a prima facie case of "reverse discrimination" under Title VII.
 
 B. Genuine Issues of Material Fact
 
 35
 We also find that the district court was correct in determining that there were no remaining issues of material fact. Murray contends a factual dispute existed over whether the other clerks who incurred shortages were also required to repay them before resuming work. This dispute, Murray argues, precluded summary judgment. We do not agree. Murray failed to show that the two affiants, she and a union representative who submitted affidavits in support of this contention, were competent to testify about the shortages incurred by other mutuel clerks. See 6-Part 2 J. Moore, Moore's Federal Practice, p 56.22, p. 53-1306 (2d ed. 1985); Fed.R.Civ.P. 56(e). The district court, therefore, did not err in finding Murray's affidavits incompetent to dispute the testimony of the defendants' record keeper who testified on the basis of the racetrack collection records. The defendants' record keepers refuted Murray's unsupported contention by testifying that no employee resumed work before repaying prior shortages. See 603 F.Supp. at 484. Thus, no genuine dispute of material fact on this issue existed.
 
 
 36
 Murray further proffers the fact that the defendants concede she was treated differently from other employees. (Appellant's Brief at 9.) We fail to see the significance of this point. Different treatment does not constitute disparate treatment absent evidence of a disparate comparison to a similarly situated coworker or evidence supporting an allegation of illegitimate reasons for the employer's actions. Furnco Construction Company v. Waters, 438 U.S. at 577, 98 S.Ct. at 2949. Murray failed to sufficiently dispute the defendants' proof that she was not similarly situated to the black mutuel clerks and that her chronic, unprecedented shortages, not racism, precipitated the defendants' demand that Murray sign the shortage statement. As no material factual disputes remained and as Murray could prove no set of facts that would entitle her to relief, the district court properly granted summary judgment for the defendants on the Title VII claim. Leonard v. City of Frankfort Electric and Water Plant Board, 752 F.2d 189, 193 (6th Cir.1985).
 
 II.
 SECTION 1981 CLAIM
 
 37
 It is well settled that an action based upon 42 U.S.C. Section 1981 requires the plaintiff to demonstrate that the defendants intentionally discriminated against her on the basis of race. General Building Contractors Association, Inc. v. Pennsylvania, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); Memphis v. Greene, 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981); Leonard v. City of Frankfort Electric and Water Plant Board, 752 F.2d at 193. From our review of the record, it is clear Murray submitted in support of her prima facie case neither direct nor circumstantial evidence of intentional racial discrimination. In light of Murray's additional failure to sufficiently proffer a prima facie case of intentional race discrimination under Title VII, see Murray v. Thistledown, 603 F.Supp. at 485, her Section 1981 claim must fail as a matter of law.
 
 
 38
 Accordingly, we affirm the district court judgment for the reasons set out in the district court's opinion.
 
 
 
 *
 Honorable Stewart A. Newblatt, United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 42 U.S.C. Sec. 2000e-2 provides in relevant part:
 Sec. 2000e-2. Unlawful employment practices--
 Employer Practices
 (a) It shall be an unlawful employment practice for an employer--
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 
 
 [2]
 42 U.S.C. Sec. 1981 provides:
 Sec. 1981. Equal rights under the law--
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.