NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0442n.06

No. 15-4149

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 02, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PAUL NELSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF OHIO |
| BALL CORPORATION and BALL METAL | ) | |
| FOOD CONTAINER, LLC, | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |

**Before: GILMAN, WHITE, and STRANCH, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** In this employment-discrimination case, a former employee of a food-packaging factory appeals the district court's grant of summary judgment in favor of the factory. The employee, a Caucasian male, was fired after making statements indicating that he would kill one or more coworkers if he were terminated. He alleged that his termination amounted to reverse race discrimination. The district court disagreed, holding that he had failed to meet his prima facie burden of establishing such a claim. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

**A. Factual background**

The opinion rendered by the district court aptly states the following relevant facts:

Plaintiff [Paul Nelson] worked as an "end bagger" for [Ball Metal Corporation and Ball Metal Food Container, LLC, (collectively, Ball Metal)] in

its Columbus facility. Plaintiff's job as an end bagger consisted of bagging the metal ends produced in the Ball Metal factory, placing the ends onto a pallet, and using a forklift to move the pallet.

Although Plaintiff had generally positive performance reviews, he was fired after twelve years of employment on September 12, 2013. The events culminating in Plaintiff's termination took place on September 6 and 7, 2013. First, Plaintiff told another Ball Metal employee, Rob Lemaster ("Lemaster") that if Plaintiff lost his job at Ball, Plaintiff would[] "[g]o out and kill a bunch of people that I hate." Second, Plaintiff was involved in a verbal and possibly physical altercation with an African-American Ball Metal employee, George McCray ("McCray"). McCray worked as a utility palletizer in the welding department. Third, the next day, Plaintiff told Lemaster that if Plaintiff lost his job, McCray would go missing.

On September 6, 2013, Plaintiff was involved in a workplace accident when he smashed a pallet on his forklift. As a result, Plaintiff took a mandatory drug test the same day. At the end of his shift, Plaintiff was in the break room waiting to clock out. Plaintiff was speaking to Lemaster about his drug test that day. Numerous other employees were in the area at the time, including Mike Garrelts ("Garrelts"), James Green ("Green"), and Chris King ("King"). . . . Lemaster asked Plaintiff what would happen when or if Plaintiff failed the drug test. Plaintiff responded to Lemaster's question [by saying], "I don't know. Go out and kill a bunch of people that I hate." Plaintiff claims [that] his comment was a joke that nobody took seriously.

At some point after his comment to Lemaster, Plaintiff claims [that] he stepped out of the clock-out line to wash his hands and then attempted to return to his place in line. Upon returning to the line, he was confronted by McCray. Although McCray and Plaintiff were surrounded by other Ball Metal employees, there are conflicting reports of the confrontation. Plaintiff asserts [that] McCray became very angry when Plaintiff attempted to re-enter the line because McCray believed [that] Plaintiff was cutting the line. Plaintiff testified that McCray then went into an expletive-laced tirade for the next six minutes and that McCray used his forearm and elbow to push Plaintiff. Plaintiff further alleges that following this incident, McCray followed Plaintiff to Plaintiff's car where McCray continued to berate Plaintiff with insults and expletives. Plaintiff sped away as soon as he could. The day after the incident, . . . Plaintiff told Lemaster that if Plaintiff got fired because of McCray, then "George [McCray] was going to come up missing." Plaintiff told Lemaster not to say anything to anyone.

King first reported Plaintiff and Lemaster's break room conversation to Ball Metal supervisors Duane Hook ("Hook"), a welding chief, and Corey Wise ("Wise"), the welding supervisor. King felt that Plaintiff had overstepped his bounds[,] even though he did not believe Plaintiff would come back and kill anybody. . . .

. . . .

After Wise collected [King's, Green's, and Garrelts's] witness statements, he presented his findings to Brad Riley ("Riley"), the plant supervisor. Wise and Riley decided to talk to Plaintiff about the incidents of the previous day. During the interview, Plaintiff told Riley and Wise that he did make a statement about killing people[,] but that "he'd always been interested or involved with extreme things, dark movies, videos," and that he made statements that could be misinterpreted. Plaintiff told Riley and Wise that he did not mean he was actually going to kill people. Riley was not reassured by Plaintiff's answers and was not convinced the statement was a joke. Plaintiff prepared a written statement[,] which notes that "McCray told me I had cut in line and got in my face and pushed me with his forearm." Plaintiff asserts that he told Riley and Wise all of the things McCray said and that McCray followed him into the parking lot. [After this conversation,] Wise and Riley notified Plaintiff that he was on unpaid suspension. . . .

After Plaintiff's meeting with Riley and Wise, [Human Resources Director] Cynthia Deal . . . gathered a team to assess Plaintiff's actions. The team consisted of Deal, Peter Short, Director of Corporate Security, and Michelle Rafik, Ball Corp.'s senior counsel. . . . The Team decided to terminate Plaintiff because "the risks associated in dismissing Nelson's threat as a mere joke were too great . . . ." All Ball Metal and Ball Corp. employees who had input into Plaintiff's termination are Caucasian.

[Human Resources Manager Traci] Vanover and Riley called Plaintiff around a week later and informed him that Ball Metal decided to terminate his employment. Ball Metal offered Plaintiff $10,000 to attend four outplacement services classes designed to help him transition to a new job. Plaintiff completed the classes and received a post-tax payment of $6,630 from Ball Metal. Riley and Vanover hired security to be at the plant for the week after Plaintiff's termination and called the police to escort Plaintiff out of the building.

## B. Procedural background

Nelson filed this lawsuit in state court, claiming that his termination by Ball Metal was the result of reverse race discrimination, in violation of Ohio Revised Code § 4112. Ball Metal removed the case to the United States District Court for the Southern District of Ohio based on diversity of citizenship between the parties.

Following discovery, Ball Metal moved for summary judgment. The district court acknowledged that the affidavits in the record revealed "conflicting reports of the confrontation" between Nelson and McCray. Nevertheless, the court granted summary judgment in favor of Ball Metal as a matter of law, concluding that Nelson had failed to meet his initial burden to produce evidence that Ball Metal was the "unusual employer[] who discriminate[s] against the majority." In so holding, the court noted that the uncontroverted evidence showed that all the Ball Metal employees who participated in the decision to terminate Nelson were Caucasian. The court further observed that Nelson had "provided no evidence that [he] was replaced by an African-American, that Caucasians were grossly underrepresented, or that Ball Metal had an organizational preference for African-American employees." Given the lack of evidence showing that Ball Metal was the unusual employer that discriminates against the majority, the court determined that Nelson had failed to make out a prima facie claim of reverse race discrimination. It accordingly granted summary judgment in favor of Ball Metal. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

We review de novo the district court's grant of summary judgment in favor of Ball Metal. *See Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate when, construing the facts and drawing all reasonable inferences in favor of the nonmoving party, there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. *Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016)*;* Fed. R. Civ. P. 56(a).

4

**B. Reverse-discrimination claim**

Nelson presented no direct evidence of discrimination, so his claim under Ohio law is analyzed under the four-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Coryell v. Bank One Trust Co. N.A.*, 803 N.E.2d 781, 784-85 (Ohio 2004) (utilizing the *McDonnell Douglas* framework to analyze circumstantial evidence of discrimination under Ohio's employment-discrimination statute). Under the conventional *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of employment discrimination by showing that "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). If the plaintiff makes such a showing, the burden shifts to the defendant, who must "offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* A successful showing on the part of the defendant then shifts the burden back to the plaintiff to prove that the defendant's proffered reason was "merely a pretext for discrimination." *Id.* at 391-92.

When a plaintiff alleges reverse race discrimination, however, he bears the heightened burden of "demonstrating that he was intentionally discriminated against 'despite his majority status.'" *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (quoting *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C. Cir. 1983)). We have modified the *McDonnell Douglas* prima facie test to make it applicable when "a member of the majority is claiming discrimination on the basis of race." *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003). Under this adaptation of the *McDonnell Douglas* test, the first prong is modified to require that the plaintiff demonstrate "background circumstances to support the suspicion that

the defendant is that unusual employer who discriminates against the majority." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) (brackets omitted) (quoting *Murray*, 770 F.2d at 67). The second and third prongs remain unchanged, *see id.*, but the fourth prong is also modified to require that the plaintiff show that he "was treated differently than similarly situated employees of a different race," *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 837 (6th Cir. 2012). As discussed below, matching modifications have been made under Ohio law for reverse race-discrimination claims.

### 1. The "background circumstances" prong applies to reverse-discrimination claims brought under Ohio law

Nelson concedes that we have long applied the modified *McDonnell Douglas* prima facie test to reverse race-discrimination claims. But he argues that the "background circumstances" prong should not apply here because his suit was brought under Ohio's civil rights statute, not under federal law. This distinction is meaningful, he contends in his brief, because the text of Ohio's statute "does not expressly state" a background-circumstances requirement and "the *unusual employer* standard is not found anywhere in the text." The relevant provision of the Ohio statute provides as follows:

> It shall be an unlawful discriminatory practice . . . [f]or any employer, because of the race [or] color . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A).

Nelson's text-based argument is meritless for two reasons. First, as a threshold matter, it implicitly presumes that legal standards must be expressly stated in a statute to be controlling, in contrast to those standards developed by the courts in interpreting such statutes. Carried to its logical conclusion, the argument suggests that the courts' development of analytical frameworks,

6

including multi-part tests that aid in giving effect to statutes in a consistent and efficient manner, are at best "optional" (as Nelson would have it) and at worst irrelevant.

Nelson's argument is internally inconsistent because the legal standard that he would have us apply is *McDonnell Douglas*'s conventional, rather than modified, framework. But the *McDonnell Douglas* test, as is evident from its title, was likewise established through caselaw rather than through statutory text. Nelson thus asks us to apply one requirement that is "not found anywhere in the text" of any statute and to simultaneously ignore another. But he may not pick and choose which standard applies simply because the one that he prefers could lead to a more favorable outcome for him.

The second reason that Nelson's text-based argument is meritless is because it overlooks a long line of Ohio caselaw explicitly adopting and applying this circuit's modified *McDonnell Douglas* framework, including the "background circumstances" requirement, to reverse race-discrimination cases brought under Ohio's civil rights statute. *See, e.g.*, *Chenevey v. Greater Cleveland Reg'l Transit Auth.*, 992 N.E.2d 461, 465-67 (Ohio Ct. App. 2013) (analyzing reverse race-discrimination and constructive-discharge claims brought under Ohio Rev. Code § 4112 and reaffirming that, "in a case of reverse race discrimination, the first element [of *McDonnell Douglas*] is modified to require that the plaintiff establish that the defendant is the unusual employer who discriminates against the majority"); *Carney v. Cleveland Heights-Univ. Heights City Sch. Dist.*, 758 N.E.2d 234, 244-246 (Ohio Ct. App. 2001) (applying the modified framework to a failure-to-promote claim brought under the same Ohio statute and holding that the plaintiff had "failed to demonstrate the first element . . . that the [defendant] is an employer who discriminates against Caucasian employees"); *see also Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 339 (6th Cir. 2009) (stating that "[f]ederal case law interpreting

7

Title VII applies to cases involving alleged violations of Chapter 4112 of the Ohio Revised Code" and applying the modified *McDonnell Douglas* framework to a reverse race-discrimination claim under Ohio Rev. Code § 4112). Ohio law thus consistently applies the modified *McDonnell Douglas* framework, including the "background circumstances" prong, to reverse-discrimination claims.

The only case that Nelson cites to support his argument, *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911 (6th Cir. 2013), is inapposite for the simple reason that it interprets Michigan's civil rights statute, not Ohio's—and is therefore irrelevant to the analysis at hand. Because Ohio courts have expressly applied the "background circumstances" prong to reverse-discrimination claims under Ohio law, Nelson's assertion that the prong should not apply here is without merit.

### 2. *Nelson failed to meet his prima facie burden*

We now analyze Nelson's claim in light of the modified *McDonnell Douglas* prima facie framework set forth in *Murray*. Despite Nelson's urging that the unusual-employer prong should not apply in this case, he contends that Ball Metal was in fact "an unusual employer who prefers to retain black employees over whites in disciplinary matters" because it terminated him but did not terminate McCray.

Past cases provide numerous examples of what would constitute background circumstances sufficient to satisfy the first prong of the modified prima facie test. *See Morris*, 320 F. App'x at 339-40 (holding that sufficient background circumstances existed when a Hispanic manager replaced a Caucasian employee with a Hispanic employee); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (holding that "significant evidence in the form of statistical data" showing that the employer considered race in previous employment

decisions satisfied the first prong for the purposes of overcoming the employer's summary-judgment motion); *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002) (holding that a Caucasian applicant alleging reverse race discrimination could satisfy the first prong by showing that an African-American police chief favored the promotion of African-Americans); *Sampson v. Sec'y of Transp.*, No. 98-5669, 1999 WL 455399, at *1 (6th Cir. June 23, 1999) (unpublished) (concluding that the first prong was satisfied where the plaintiff provided evidence of "an organizational preference for establishing a diverse group of employees").

None of the relevant circumstances described in the aforementioned cases exists here. Most fatal to Nelson's prima facie case is the undisputed fact that all of the employees involved in the investigation and subsequent termination of Nelson were Caucasian. Moreover, he presented no statistical evidence that Ball Metal unlawfully considered race in past employment decisions. *See Sutherland*, 344 F.3d at 615-16. Nor did he provide any facts indicating that Ball Metal had an "organizational preference" for African-American employees. *See Sampson*, 1999 WL 455399, at *1.

Consistent with the district court's determination, we find no evidence of any background circumstances suggesting that Ball Metal is the unusual employer that discriminates against the majority. Nelson's failure to satisfy this essential element of his case obviates the need for any further analysis of his reverse-discrimination claim. *See Zambetti*, 314 F.3d at 256-57 (noting that, "[u]nless [the] plaintiff is able to satisfy prong one, . . . the court does not even reach" questions of whether the employer had a legitimate reason for terminating the plaintiff or whether the proffered reason was pretextual).

### 3. *Nelson's challenge to the "background circumstances" prong*

In a final attempt to save his case, Nelson urges in his brief that we abandon the "background circumstances" prong "in the interest of justice" or, alternatively, make it "an optional element of the Plaintiff's case at the Plaintiff's election." Nelson's request that we upend our well-established framework is misguided not only as a matter of precedent, but also as a matter of historical context.

When this circuit first adopted the reverse race-discrimination framework in 1985, we did so with the express acknowledgement that the "premise underlying" the *McDonnell Douglas* framework "stems from Congressional efforts to address this nation's history of discrimination against racial minorities, a legacy of racism so entrenched that we presume acts, otherwise unexplained, embody its effect." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Given this historical focus on eliminating entrenched discrimination against racial minorities, "the reverse discrimination complaintant bears the burden that he was intentionally discriminated against *despite* his majority status." *Id.* (emphasis added) (citation and internal quotation marks omitted).

Such an approach accords with that taken by several of our sister circuits. *See, e.g.*, *Phelan v. City of Chicago*, 347 F.3d 679, 684-685 n.1 (7th Cir. 2003) ("The *McDonnell Douglas* test was created to remedy discrimination against groups that have historically suffered . . . ."); *Mattioda v. White*, 323 F.3d 1288, 1292 (10th Cir. 2003) (noting that, in adopting a modified framework, "this court recognized that members of the majority group are not necessarily entitled to a presumption of discrimination afforded to members of a minority group"); *Parker v. Balt. and Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981) (observing that "[m]embership in

a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated," and reasoning that "it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society") (italics added).

In any event, "a later panel of the court cannot overrule the published decision of a prior panel . . . in the absence of en banc review or an intervening opinion on point by the Supreme Court." *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015) (citing *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)). We are therefore bound by this circuit's longstanding precedent governing reverse race-discrimination claims, making Nelson's argument that we abandon such a framework unavailing.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.