NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0542n.06

No. 17-3327

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| STEVE FLETCHER, | ) | **FILED** |
| | ) | Sep 28, 2017 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| U.S. RENAL CARE, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:     KEITH, ROGERS, and McKEAGUE, Circuit Judges.

ROGERS, Circuit Judge. Steve Fletcher claims that while working as a registered nurse at U.S. Renal Care, he was forced to endure a campaign of discriminatory scrutiny and mistreatment by an African-American manager, because he is white. In this suit, Fletcher alleges that a racially discriminatory and retaliatory campaign led to his constructive discharge, in violation of both federal and Ohio law. The district court, however, properly granted summary judgment against him. There is not sufficient evidence to raise a genuine issue of material fact that Fletcher was in fact constructively discharged, or that his complaints to management were the cause of his discipline.

In October 2013, after working as a "float" nurse at several of U.S. Renal Care's Cincinnati dialysis clinics, Fletcher accepted a position as a registered nurse in the company's Norwood, Ohio clinic. He soon transferred again to the Kenwood clinic, and appears to have

worked there without incident until May 2014, when his first supervisor, Anita Johnson, who is African-American, was replaced by Devon Nelson, who is also African-American. It was then that Fletcher claims the problems central to this suit began.

Although Fletcher points to a number of incidents, the first sign of trouble appears to have come only a month after Nelson arrived at Kenwood, when Fletcher claims that Nelson told him that he would no longer be allowed to wear black jeans to work, as he had for several months, but would instead have to wear scrubs. Fletcher raised that policy change with Nelson's supervisor, Sabon Shelton, who told him he could continue wearing his jeans until the matter could be addressed at an already-scheduled nurses' meeting. Fletcher also brought his complaint to the attention of Andrea Foley, a human-resources manager, writing to her that he believed Nelson had "chosen to single out and harass only the Caucasian person[nel]," including Fletcher. In response, Foley, who is also white, explained to Fletcher that "[i]t would be unfair to single [him] out," and that if his clinic was determined to be "scrubs only, that [would] go for everyone."

Two days later, Fletcher again wrote Foley, telling her that he was "not the only one in the clinic to see the racism demonstrated by" Nelson, and that another employee, Benjamin Ullman, had left U.S. Renal Care, because he was unwilling to put up with Nelson's "racist attitude one more day." Ullman claims to have complained to human resources about his own concerns of "racism," but received no response.

Around the same time, Fletcher claims that he had two more encounters with Nelson that, he says, suggested Nelson's racial animus. The first incident came after Nelson accused Fletcher of putting a doctor's order on the wrong patient's chart—a potentially dangerous mistake. Nelson claims to have discussed the charting issue with Fletcher soon after the alleged mistake

was discovered. According to Fletcher, however, he made no such mistake, which, he alleges, Johnson confirmed for him.

The second incident came not long after the charting concern, when Fletcher cracked a tooth, exposing a nerve and leaving him in considerable pain. Instead of "call[ing] off," Fletcher reported to work, and asked Johnson if she would cover for him for an hour so he could see a dentist. Johnson agreed, and Fletcher scheduled his appointment. Once Nelson arrived, however, she told Fletcher that she could not authorize the time off, but that he should "do what [he] need[ed] to do." Fletcher left anyway, and the next day he again wrote Foley, telling her that Nelson "ha[d] become more hostile," and that "[h]er attitude and singling out ha[d] become more frequent and more aggressive."

Around that time, Nelson also brought Fletcher's alleged charting errors to the attention of Scott Sasserson, U.S. Renal Care's chief operating officer, detailing Fletcher's apparent failure in one instance to name the doctor who issued a medical order as well as his placement of the patient note on the wrong chart. Sasserson passed those concerns on to Foley, who began investigating Fletcher's performance. During the investigation Foley asked Joanne Zimmerman, the company's vice president of clinical services, to review Fletcher's charting notes. Zimmerman was reportedly "shocked at how lacking [Fletcher's] written orders" were, and suggested that Fletcher be put "on final warning," which, according to Foley, was standard practice whenever a "patient safety issue requir[ed] discipline." Like Foley, both Sasserson and Zimmerman are white.

Foley, along with Shelton and Sasserson, then decided to discipline Fletcher. Although Nelson took no part in the decision, she presented Fletcher with a written counseling form, listing the various charting and other errors that had raised safety concerns as well as other acts

3

of insubordination, including Fletcher's continuing to wear jeans and his abruptly leaving work to tend to his tooth. In the presence of Sasserson and Shelton, Fletcher ultimately signed the form, over Fletcher's "strong[] disagree[ment]," and without the opportunity to protest the infractions. A few days later Fletcher resigned from U.S. Renal Care, stating in his resignation notice that "[t]he work place has become hostile and intolerable due to racism, retaliation, and other questionable behavior by management." He was soon replaced by another nurse, Samantha Waggoner, who is also white.

Fletcher then filed this suit, alleging that U.S. Renal Care constructively discharged him on account of his race and retaliated against him for complaining about that allegedly discriminatory treatment, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, as well as Ohio's counterpart civil-rights statute. U.S. Renal Care moved for summary judgment, and the district court granted it on both of Fletcher's claims.

The court first concluded that Fletcher, who had offered no direct evidence of racial animus, had failed to make out a *prima facie* case of reverse discrimination. The district court noted that the first prong of the *McDonnell-Douglas* framework—whether U.S. Renal Care was the "unusual employer who discriminates against the majority," *Nelson v. Ball Corp.*, 656 F. App'x 131, 134–35 (6th Cir. 2016)—presented a "close question." But the court ultimately left that question unresolved, concluding that Fletcher's case would fail regardless of that answer, under the third and fourth prongs.

As to the third prong, the court determined that Fletcher had failed to show that he had suffered an adverse employment action, through his alleged constructive discharge. None of the circumstances Fletcher cited—his disciplinary warning, his alleged concern that U.S. Renal Care would file a false report against him with the State Board of Nursing or that he would be fired, or

his complaints about Nelson's supervision—was enough, the court held, to indicate that U.S. Renal Care had deliberately set out to make his working conditions intolerable.

Nor had Fletcher shown that similarly situated employees were treated differently because of their race, the court concluded, or that he was replaced by an employee of another race, as required by *McDonnell-Douglas*'s fourth prong. In fact, Fletcher's replacement was a white female nurse, and the only allegedly differential treatment he pointed to—that African-American employees were allowed to take longer lunches, that other nurses were allowed to wear sweatpants rather than jeans, and that there were managers who made charting errors without being similarly disciplined—all involved employees who were not similarly situated. Thus, under any of these prongs, the court concluded that Fletcher's discrimination claim could not succeed.

Fletcher's retaliation claim also could not survive summary judgment, the district court held, even though the court found that he had satisfied the first three elements of his *prima facie* case—that he had engaged in a protected activity known to U.S. Renal Care, and had suffered a materially adverse action as a result. The problem, the court held, was with causation. The primary evidence of causation that Fletcher offered was temporal: only a few weeks separated Fletcher's complaints and his disciplinary warning. But that was inadequate, the court concluded, not only because Nelson had discussed disciplining Fletcher before he had brought his concerns to Foley's attention, but also because other personnel, relying on company policy, were responsible for the decision to issue Fletcher the warning, providing an "intervening legitimate reason" for his discipline, *Green v. Central Ohio Transit Auth.*, 647 F. App'x 555, 561 (6th Cir. 2016). Although Fletcher also pointed to comments by Foley allegedly suggesting that she thought he complained excessively, the court deemed those comments insufficient to

establish causation as well. According to the court, the context for those comments instead revealed that Foley was only trying to ensure that Fletcher felt that his concerns were understood and were being addressed.

The district court accordingly granted summary judgment for U.S. Renal Care, and Fletcher now appeals.

Fletcher first argues that questions of material fact remain on his claim of reverse discrimination, warranting reversal. Because Fletcher has come forward with no direct evidence of discrimination, he must make out a *prima facie* case of discrimination under *McDonnell Douglas*, including showing that he suffered a "materially adverse change in the terms or conditions" of his employment. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). There is no genuine issue of material fact, however, that Fletcher has done so. Thus, his discrimination claim, reviewed de novo, *see id.*, fails at the first stage.[1]

Fletcher contends that U.S. Renal Care did in fact subject him to a materially adverse employment action on account of his race, through constructive discharge. But this claim is not sufficiently borne out by the record to withstand summary judgment. In order to establish a constructive discharge, Fletcher has to make two showings: (1) that U.S. Renal Care "deliberately created intolerable working conditions, as perceived by a reasonable person," and (2) that the company did so to get him to quit. *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005) (quoting *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001)). Here, Fletcher points to a number of actions that, he alleges, were deliberately taken to make his working conditions intolerable. Those actions include: the allegedly false

---

[1] Because the Ohio courts analyze discrimination claims brought under Ohio law according to the same standards as claims under federal law, *see Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 163 (6th Cir. 2004) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131-32 (Ohio 1981)), our analysis of Fletcher's federal claims disposes of his state law claims as well.

accusations Nelson made about his charting, her declining to authorize his leaving early for the dentist and telling him to wear scrubs pursuant to company policy, and the final warning Fletcher received for those infractions, among others. But none of this adds up to a showing under either prong of a constructive-discharge claim.

First, even viewing this record in the light most favorable to Fletcher, as we must, *see Laster*, 746 F.3d at 726, none of these actions appears to rise to the sort of "badgering, harassment, or humiliation" that we have deemed actionable as constructive discharge, *id.* at 728. The criticisms Fletcher received for his alleged charting errors, as well as the way Nelson handled the scrubs-only policy and his request for time off to get his tooth pulled, all concern the manner in which the company supervised him and assigned him duties. Generally, however, actions like these are "insufficient to establish a constructive discharge as a matter of law," *Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004), and Fletcher cites no case suggesting that they would be here.[2]

Fletcher does point to the allegedly "racially hostile environment" at Kenwood as another basis for his constructive-discharge theory. But none of the evidence he cites for that claim suggests that he or any other white employee was ever badgered, harassed, or humiliated. Instead, Fletcher, along with Ullman, appears to allege only that some African-American employees were occasionally treated more leniently by their African-American supervisors. But that is a far cry from the sort of abusive, racially charged comments that we have found would

---

[2] Fletcher does cite *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999), but his reliance on that case is misplaced. In *Jackson*, we held that where a plaintiff comes forward with specific evidence of racism, like co-workers' frequent and obviously derogatory use of racial hate words, *see id.* at 653, that evidence would matter in determining whether the work environment was objectively hostile, just as evidence that the plaintiff learned of those incidents would also matter in determining whether the plaintiff "subjectively perceived" that hostility. *Id.* at 661 (emphases added). But here, as explained above, Fletcher has pointed to no such derogatory or abusive comments directed against him or anybody else.

create a genuine question of fact as to whether there was an intolerable atmosphere in the workplace, such as in *Logan*, where an African-American employee was forced to endure her colleagues' taunts about "your people," being told at one point that "[w]e don't serve 'grits' here." 259 F.3d at 572.

Moreover, even if this sort of differential treatment and heightened scrutiny might create a question of fact under the first prong of a constructive-discharge theory, it still would be inadequate under the second. Such scrutiny or treatment does not necessarily mean that there was an intention to force an employee out. *See Laster*, 746 F.3d at 728. Nor has Fletcher suggested that anybody ever told him that he was going to be fired, or that he should quit. Instead, relying on *Lee v. Cleveland Clinic Foundation*, 676 F. App'x 488 (6th Cir. 2017), Fletcher argues that reasonable jurors might find that intent in the way Sasserson chose to deliver the final warning to him, without letting Fletcher argue his side.

Fletcher's reliance on *Lee*, however, is misplaced. There the plaintiff had come forward with concrete evidence of harassment—other employees had directed "derogatory racial slurs" at her, and repeatedly asked her when she would retire—that her employer apparently declined to investigate. *Lee*, 676 F. App'x at 495. Fletcher has pointed to no such evidence here—no racial slurs, no questions implying he should leave. Moreover, the record shows that Fletcher had serious problems with his charting—indeed, "shocking" ones, according to Zimmerman, another white manager—and Fletcher does not appear to dispute that under those circumstances it was company practice to issue a final warning. By the time Fletcher was asked to sign the counseling form, there was nothing he could have said that would have changed that practice, or that would have undone Zimmerman's recommendation to discipline him. It was therefore only reasonable

for Sasserson to insist at that meeting that he and Fletcher would have to "agree to disagree" about the final warning. That is hardly evidence that Sasserson was trying to force him out.

Fletcher tries to resist this conclusion by repeating his belief that working under Nelson was "untenable" and that she and others really did want him out, and that a jury reviewing the same record might agree with him. But that is speculation, not evidence, and on summary judgment, Fletcher, even as the non-moving party, "must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). As explained, such evidence is lacking here. Fletcher has consequently failed to show that he was constructively discharged or, as a result, that he was the subject of actionable race discrimination.

Fletcher's next claim on appeal—that U.S. Renal Care retaliated against him for his complaints about Nelson's alleged racism—fares no better. Fletcher contends that the district court correctly found that he could meet the first three elements of a *prima facie* case for retaliation—that his complaints about Nelson were (1) protected activity (2) that was known to the company and (3) led to a materially adverse action, namely, his final warning. *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 649 (6th Cir. 2015). Fletcher argues, however, that the district court was mistaken in concluding that he had failed to establish the fourth element, showing "a causal connection between the protected activity and the adverse employment action." *Id.* (citation omitted). Here we need not decide whether the district court was right as to the first three elements, because Fletcher's evidence of causation is too tenuous to support a *prima facie* case of retaliation. This claim, reviewed de novo, *see Laster*, 746 F.3d at 726, accordingly fails as well.

9

In arguing his case for causation Fletcher relies primarily on a theory of temporal proximity, pointing to the few weeks that separated his complaints about Nelson and the disciplinary warning that ultimately led him to quit. But even if this close succession of events were enough to support a causal inference, as such proximity has in other cases, *see, e.g.*, *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525-26 (6th Cir. 2008), that inference is rebutted here by the intervening concerns about Fletcher's charting. In *Wasek v. Arrow Energy Services*, 682 F.3d 463 (6th Cir. 2012), we explained that even though close temporal proximity can support the causal element of a *prima facie* case of retaliation, an "intervening legitimate reason to discipline" an employee can nevertheless defeat that inference. *Id.* at 472. Here, there was just such an intervening reason: Nelson caught what she believed was another potentially dangerous charting error by Fletcher, and Fletcher does not appear to dispute that it was Nelson's report about that error that led Sasserson and other managers to independently review his performance, culminating in the final warning that company policy required. Like the plaintiff's walking off the job in *Wasek*, *see* 682 F.3d at 472, this intervening event provided a similarly legitimate reason under the company's safety policy for the disciplinary warning Fletcher received.

To resist this conclusion, Fletcher argues that the alleged charting error was, in fact, not an error, citing Johnson's agreement to that effect at the time. But it is undisputed that Nelson believed that Fletcher made a mistake in his charting, and Fletcher has offered no evidence suggesting that that belief belied a retaliatory motive. Indeed, it is hard to see what evidence he could offer, given that, at the time, Nelson did not even know that Fletcher had complained about her alleged discrimination Whether or not Johnson sided with Fletcher about the charting issue, as Fletcher claims, is thus irrelevant to whether Nelson had a legitimate reason to report what she

saw as a mistake, and equally irrelevant to whether the company reasonably decided on that basis to investigate. Once Zimmerman independently confirmed that error, U.S. Renal Care had all the reason it needed to discipline Fletcher, dispelling whatever causal inference might have been drawn from the proximity of his complaints and his disciplinary warning.

Fletcher's two further grounds for finding causation are also unavailing. Fletcher first contends that the fact that his counseling form listed all of his prior infractions suggests that he was being subjected to heightened scrutiny for his complaints. But we have made clear that the "critical" question for purposes of causation is whether "the scrutiny *increased*" after the employee engaged in the protected activity. *Hamilton v. GE*, 556 F.3d 428, 436 (6th Cir. 2009). Here, Fletcher himself concedes that five of the seven incidents mentioned in his counseling form came to light before he complained about Nelson, and those incidents were already the subject of ongoing concern for both Nelson and Foley before his first complaint. Thus the fact that his counseling form listed those incidents—which Foley explained was simply company practice anyway—hardly speaks to whether the scrutiny of Fletcher's performance increased.

Fletcher further argues that reasonable jurors could find a retaliatory animus in a remark made by Foley, suggesting that Fletcher "complained a lot" and was a "frequent flyer." But the complete context of that remark makes clear that Foley's intent at the time was not retaliatory but remedial: she was counseling Nelson in how to manage Fletcher's concerns given how many of them he had, so that he would feel that those concerns had been understood and were being addressed. Moreover, that counseling came in response to concerns Nelson had raised about Fletcher's performance on May 20, 2014—several weeks *before* Fletcher lodged his first complaint about Nelson, in early June. As Foley clearly could not have harbored a retaliatory

animus for a complaint Fletcher had yet to make, he cannot rest his *prima facie* case of retaliation on this basis either.

The judgment of the district court is affirmed.