# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 13, 2024

Lyle W. Cayce
Clerk

No. 22-50158

———

B.W., *a minor*, *by next friends* M.W. *and* B.W., *formerly known herein as* JON AISD DOE,

*Plaintiff—Appellant*,

*versus*

AUSTIN INDEPENDENT SCHOOL DISTRICT,

*Defendant—Appellee*.

———

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:20-CV-750

———

Before ELROD, *Chief Judge*, and KING, JONES, SMITH, STEWART, RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

CAROLYN DINEEN KING, *Circuit Judge*, joined by STEWART, RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, DOUGLAS, and RAMIREZ, *Circuit Judges*:

By reason of an equally divided en banc court, the decision of the district court is AFFIRMED. The panel opinion was vacated by the grant of rehearing en banc.

No. 22-50158

Priscilla Richman, *Circuit Judge*, joined by Southwick, Douglas, and Ramirez, *Circuit Judges*, concurring:

Accepting B.W.'s allegations as true, AISD students unquestionably bullied him, although the primary impetus of the bullying was, according to B.W., his political beliefs. Faculty also made inappropriate statements and remarks. The Fourth Amended Complaint is also conclusory as to how AISD had notice of harassment or discrimination *based on race*, though AISD certainly was apprised that B.W. was harassed due to his conservative political views. But assuming that B.W.'s Fourth Amended Complaint does assert that AISD knew he suffered discrimination or harassment based on race and failed to take corrective measures in a timely manner, B.W. does not allege "harassment [] based on [his] 'race,'"[1] as opposed to political differences, that was "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to [the] educational opportunities or benefits provided by the school."[2] Therefore, I would affirm the district court's dismissal of his case.

Title VI claims require that "the harassment was based on the victim's 'race, color, or national origin.'"[3] The allegations that pertain to race do not surmount the threshold required in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*.[4] B.W.'s operative Complaint alleged that a math class aide "repeatedly called B.W. 'Whitey,'" and a group of students shouted at him and other Cross Country teammates, "here are all the white

---

[1] *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 n.23 (5th Cir. 2015) (quoting 42 U.S.C. § 2000d).

[2] *Id.* at 408 (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

[3] *Id.* at 409 n.23 (quoting 42 U.S.C. § 2000d).

[4] 526 U.S. 629, 650 (1999).

boys!" A teacher asked him if he "enjoyed his White Gospel Music." A substitute teacher told B.W., "I will not have a white man talk to me about gender issues!" A teacher told B.W. that she was "getting concerned about how many white people there are." A student told B.W., "America is only for white people," and another student "repeat[ed] the evils of the white race in American history" to B.W. These comments over the course of years do not constitute "severe, pervasive, and objectively offensive"[5] conduct sufficient to give rise to a cause of action for damages.

The fact that some of these comments were made by faculty, not students, does not cause the circumstances faced by B.W. to rise to the level of severity or pervasiveness required for racial harassment to be actionable. We have explained that "[i]ntense verbal abuse that comes from an authority figure—like a school administrator—and persists for most of the school year can constitute a hostile educational environment."[6] In *Sewell v. Monroe City School Board*,[7] the plaintiff alleged that the Dean of Students "verbally 'ridiculed' him 'every other day' for much of the school year," "discouraged other students from talking" to him, and "tried to convince a student to concoct an allegation that [the plaintiff] sexually assaulted her."[8] B.W. does not allege the same level of "[i]ntense verbal abuse."[9]

B.W. alleged that a student made a meme of him as a KKK member.[10] The pleading standards require that "all *reasonable* inferences that can be

---

[5] *Fennell*, 804 F.3d at 408.

[6] *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 585 (5th Cir. 2020).

[7] 974 F.3d 577 (5th Cir. 2020).

[8] *Id.* at 581, 585.

[9] *Id.* at 585.

[10] *Post* at 14.

drawn from the pleading are drawn in favor of the pleader."[11]  However, *B.W.'s own pleadings*, which we "must accept as true,"[12] assert that the meme was motivated by politics and not race.  B.W.'s complaint specifically alleges that "D.K. admitted to the school that he made the KKK meme about B.W. because D.K.'s father told him not [to] be friends with anyone who was a Conservative."

B.W. alleges that he was called a "racist," and that during the latter part of the 2019 school year, "other students called him a racist daily, he was 'flicked off' daily, and also cussed at daily."  This continued in the 2019 fall semester.  Being called a racist is not the equivalent of being harassed based on the harassment victim's race.  Being accused of racism says nothing about the race of the accused.  A racist or alleged racist could be a person of virtually any color.  The pejorative term is used because of the accused's own alleged views about race, not because of the accused's race.  The "flicking off" and "cussed at" allegations, read in context, were alleged to have been motivated by B.W.'s "Conservative and Republican political opinions" and his support for Donald Trump.  The complaint does not allege they were racially motivated.

B.W.'s Fourth Amended Complaint sets forth the intense bullying and even physical assaults that he suffered over a course of years while in Austin public schools.  It is sickening and reprehensible that a middle-school and later high-school student would be subjected to what B.W. says he had to endure and that school officials did not act decisively to bring an end to the bullying and harassment.  But B.W.'s complaint, thirty-nine pages long,

---

[11] 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (4th ed. 2024) (emphasis added).

[12] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

No. 22-50158

makes clear that the impetus for the harassment and bullying was his political beliefs, actions, and expressions and those of his classmates. The relatively few race-based comments recounted in the operative Complaint are not the sort of harassment that is actionable under Title VI.

Harassment based on race, as opposed to political differences, must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to [the] educational opportunities or benefits provided by the school."[13] That did not happen here. I would affirm the district court's dismissal of B.W.'s claim.

---

[13] *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)); *cf. Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 235 (5th Cir. 2020) (per curiam) (unpublished) (describing allegations that: school officials prohibited the father of Z.B., a Muslim student, from bringing halal food to his son for lunch so that his son could learn to be "independent"; when Z.B. spilled his halal food at lunch his teacher told him to either eat "like a normal person" or "go hungry"; on a different occasion, a school official told Z.B. to "eat school food or starve to death"; Z.B. was kicked in the face by a student on the playground and at another time was hit in the neck; students asked if he was Muslim and challenged him to fight; students called him "Tally," meaning "Taliban"; while questioning Z.B. about whether his parents abused him, school officials asked Z.B. to touch his own genitals; Z.B.'s school questioned him without his parents present about a rumor that he brought a bomb to school; Z.B. was suspended from school for a day in connection with questioning about the bomb rumor; Z.B. was asked whether his father taught him how to make a bomb; and Z.B.'s father was banned from school property); *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 397, 400-03 (5th Cir. 2021) (holding, in the employment context, that an employee alleged sufficiently severe or pervasive harassment where supervisor on multiple occasions referred to him using racial slurs, including "mayate," and a coworker called him the n-word, "[t]he most noxious racial epithet in the contemporary American lexicon" (quoting *Fennell*, 804 F.3d at 409)); *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 433-34 (5th Cir. 2022) (stating harassment was "likely" sufficiently severe or pervasive where comments about Wantou included likening black people to animals by "continuously" referring to Wantou as "chimp" or "monkey").

No. 22-50158

Jennifer Walker Elrod, *Chief Judge*, joined by Jones, Smith, Willett, Ho, Duncan, Engelhardt, Oldham, and Wilson, *Circuit Judges*, would reverse the district court's judgment and remand for the following reasons:

B.W. sued Austin Independent School District alleging, *inter alia*, racial harassment under Title VI of the Civil Rights Act. In his complaint, B.W. avers that his public-school experience was marred by repeated verbal harassment and physical attacks on account of his white race. Because our court is equally divided, we are required to affirm the district court's judgment. *See United States v. Garcia*, 604 F.3d 186, 190 n.2 (5th Cir. 2010) ("Decisions by an equally divided en banc court are not binding precedent but only affirm the judgment by operation of law."). This is most unfortunate. This should be a relatively easy case under Rule 12(b)(6), applying the standards for a well-pleaded complaint. The subject matter of the case should not create confusion as to those standards. Because these factual allegations plausibly amount to severe, pervasive, and objectively offensive racial harassment, we should reverse the district court's dismissal of his claims and remand for further proceedings.

I

Before his parents withdrew him, B.W. attended middle school and high school in the Austin Independent School District. B.W. was mocked, physically beaten, and verbally abused throughout his time in the district.[1] According to the complaint, one student promised to "beat the s— out of" B.W.—and then did so—because B.W. was white. A teaching aide pejoratively referred to B.W. as "Whitey" and repeatedly belittled him for struggling with class material: "Can't figure this one out Whitey?"; "Need help Whitey?" Students repeatedly recited the "evils of the white race" to

_____

[1] For a more complete list of events in the complaint, *see* Appendix, *infra*.

B.W. in class. A teacher mocked B.W. for listening to what she called "White Gospel Music." Another teacher told B.W. that she was "concerned about how many white people there are." A third teacher told B.W. that "I will not have a white man talk to me about gender issues!" In another incident, a student went so far as to make a meme of B.W. dressed as a hooded Ku Klux Klansman and circulate it to the whole school.

All the while, Austin ISD administrators stood by and took no significant action to stop the bullying.[2] Shockingly, some of the administrators joined in the harassment. B.W.'s middle school principal, for instance, "yanked" B.W.'s ear bud out of his ear, retorted sarcastically "Are you listening to Dixie?", and then walked away, laughing to herself. Further, B.W. avers that he was subjected to daily name-calling, tripping, and obscene gestures from his classmates. He alleges that these and other similar instances occurred time and again over the course of two-and-a-half years.

The complaint also alleges that B.W. faced discrimination because of his political beliefs. Among other things, B.W. avers that he was attacked and insulted by students for wearing a shirt supporting Texas Senator Ted Cruz. He also alleges that one student threatened him because of his stated support for former President Donald Trump: "Oh my F—ing G-d, I'm going to kill all Trump supporters, I don't give a s— who hears it. I want to kill all of them." B.W. asserts in his complaint that he "was not only ostracized for being a Republican, but a broader stereotype about being a Trump supporter, Caucasian, and a Christian emerged. For example, he was soon harassed for

---

[2] B.W. alleges that his parents informed the school of the race-based harassment that he was experiencing on numerous occasions: "[E]ven though Plaintiff's parents made a number of explicit complaints, believing B.W. to be a victim of bullying and harassment because of his political beliefs, and *racial stereotypes*, no school staff person or official ever reported such complaints to the School District Superintendent as required by School Board Policies and Procedures." (emphasis added).

being a racist, and anti-feminist and anti-gay when he and his family are absolutely not."

The district court dismissed B.W.'s complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  The panel opinion affirmed that decision, thus denying B.W. the opportunity to proceed to discovery.  It ignored the vast majority of the allegations in B.W.'s complaint because, in its view, "the bulk of the Complaint's allegations do not mention B.W.'s race at all."  *B.W. ex rel. M.W.  v. Austin Indep. Sch. Dist.*, No. 22-50158, 2023 WL 128948, at *5 (5th Cir. Jan. 9, 2023), *reh'g en banc granted, vacated*, 72 F.4th 93 (5th Cir. 2023).  The panel opinion held that B.W.'s claim was a "flawed attempt[] to conflate political with racial animus."  *Id.* at *6.  That holding departs from well-settled principles of both civil procedure and antidiscrimination law.

II

When reviewing a district court's dismissal of the complaint for failure to state a claim, we are required to: (1) construe the complaint "in the light most favorable to the plaintiff"; (2) take all non-conclusory allegations as true; and (3) make all reasonable inferences that can be drawn from the complaint in favor of the plaintiff.  5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (4th ed. 2024) ("Federal pleading standards . . . dictate that . . . all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader."); *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019); *Franklin v. United States*, 49 F.4th 429, 435 (5th Cir. 2022) ("We review a district court's ruling on a motion to dismiss de novo, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." (internal quotation marks omitted)); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) ("Factual allegations must be enough to raise a right to

relief above the speculative level, on the assumption that *all the allegations in the complaint are true* (even if doubtful in fact)." (emphasis added) (internal citations omitted)); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002) ("Because we review here a decision granting [Defendant's] motion to dismiss, we must accept as true all of the factual allegations contained in the complaint.").

At the 12(b)(6) stage, we are not permitted to ask what the "more reasonable" interpretation of the complaint is. We merely ask whether B.W.'s allegations, taken as true, *plausibly* state a claim for relief—even if ultimate success seems unlikely. *Twombly*, 550 U.S. at 556 ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations . . . ." (first alteration in original) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989))); *id.* ("[A] well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely . . . .'" (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974))).

As a result, facts supporting harassment of other kinds do not render facts alleging racial harassment untrue at the motion-to-dismiss stage. *See Wilson v. Birnberg*, 667 F.3d 591, 600 (5th Cir. 2012) ("The plausibility standard [for a complaint] is not akin to a probability requirement . . . ." (alterations in original) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))). However, the panel opinion and JUDGE RICHMAN's *en banc* concurrence both improperly weigh the allegations and base their decisions off what they thought was the most likely motive behind the harassment directed at B.W., political animus. This is inappropriate at the 12(b)(6) stage. That a plaintiff alleges facts consistent with other theories "does not mean that the mere existence of an alternative explanation entitles a defendant to dismissal." Wright & Miller, *supra*, § 1357. Rule 12(b)(6) only requires courts to ask if the plaintiff's allegations, taken as true, plausibly state a claim for relief. *See Iqbal*, 556 U.S. at 678–79; Wright & Miller, *supra*,

§ 1357 ("[T]here must be a factual context that supports an inference of liability as one plausible explanation for what has been alleged."). Accordingly, whether B.W.'s harassers were more likely to have been motivated by political animus as opposed to racial animus is irrelevant to proper 12(b)(6) analysis. *Birnberg*, 667 F.3d at 600; *see also Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767–68 (5th Cir. 2019).

This principle extends to incidents that "could be race-neutral or racially charged, depending on context." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 584 (5th Cir. 2020). "At the pleading stage, [B.W.] is entitled to the latter characterization." *Id.* at 585; *see Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 402 (5th Cir. 2021) (determining that, at summary judgment, the court was required to draw the inference that the word "mijo" was used offensively, even though it often is a term of endearment). Simply put, the fact that B.W. was bullied in part based on other characteristics in addition to his race does not eliminate the race-based nature of the harassment. *See Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1049 (10th Cir. 2020); *see also Sewell*, 974 F.3d at 584 (Title VI claim plausible even though the verbal abuse implicated both race and sex); *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 456–60 (5th Cir. 2013) (en banc).

The panel opinion and JUDGE RICHMAN's *en banc* concurrence fail to draw all plausible inferences in B.W.'s favor. B.W.'s allegations of daily bullying—taken in context—plausibly amount to racial harassment. Recall that B.W. alleges that another student (I.L.) threatened to "beat the s— out of [B.W.]." I.L. then followed through on that threat by repeatedly punching B.W. until B.W. was lying on the floor bleeding. Afterwards, B.W. found out that I.L. told other students that he assaulted B.W. because B.W. was white. B.W. then heard that I.L.'s friends were out to get him because he reported the assault. For the remainder of his time at Austin ISD, B.W. experienced

repeated harassment from students calling him a racist, tripping him, swearing at him, and giving him the middle finger.

When a student is physically attacked because of his race, his attacker brags about it to the whole school, and other students, teachers, and administrators mock him with specific reference to his skin color, it is certainly reasonable to infer that continued harassment of the victim is—at least in part—based on the victim's race. *Sewell*, 974 F.3d at 584 (holding that the plaintiff was entitled to a characterization of the word "thug" as racially charged at the pleading stage, despite that word being "race-neutral" in some contexts); *see Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (explaining that use of the term "boy" could be evidence of discriminatory animus based on contextual factors); *Johnson*, 7 F.4th at 403 (noting that when "further evidence of mistreatment" was considered "in the context of [a fellow employee's] verbal harassment, it could be inferred that these actions were likewise motivated by racial animus"). Further, it is reasonable to infer that the verbal abuse from students, such as calling B.W. a racist, was at least partly based on B.W.'s race because he alleges that he was subject to a "broader stereotype" that included his race. At this stage, B.W. is entitled to those inferences. *See White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021) (requiring review of a 12(b)(6) dismissal to "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff"); *Bellow v. LeBlanc*, 550 F. App'x 181, 183 (5th Cir. 2013) (citing *Toy v. Holder*, 714 F.3d 881, 883 (5th Cir. 2013)) (same).

## III

To prevail against a school district on a claim for racial harassment under Title VI of the Civil Rights Act, the plaintiff must establish four conditions:

(1) [T]he harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities or benefits provided by the school" . . . , and the district (2) had actual knowledge, (3) had "control over the harasser and the environment in which the harassment occurs," and (4) was deliberately indifferent.

*Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644, 650 (1999)).

At this stage of the proceedings, Austin ISD does not contest prongs two, three, or four, which require, on the part of the school district, actual knowledge, control over the harasser, and deliberate indifference. Indeed, in both its panel and *en banc* briefing, Austin ISD has stated that "the district agrees that at least in this case *as pled*, the issue of 'deliberate indifference' was probably not amenable to resolution on a Rule 12(b)(6) motion." Mr. Gilbert (Austin ISD's attorney) reiterated this point at oral argument: "One thing I think it's important to remember in this case is we did not move to dismiss on the grounds of deliberate indifference."[3]

The only contested condition is prong one, which asks whether the complaint plausibly alleges racial harassment that is sufficiently "severe, pervasive, and objectively offensive." To satisfy these conditions, "the harassment must have had a 'concrete, negative effect'" on the plaintiff's education. *Sewell*, 974 F.3d at 585 (quoting *Fennell*, 804 F.3d at 410). In examining that question, courts consider "the frequency of the

---

[3] When asked to confirm this statement, Mr. Gilbert once more stated that the district was not contesting deliberate indifference at the motion-to-dismiss stage. Q: "So you're saying the complaint is sufficient for deliberate indifference? You didn't move for dismissal on that basis?" A: "That's correct."

discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes" with the student's education. *See Shepherd v. Comptroller of Pub. Accts.*, 168 F.3d 871, 874 (5th Cir. 1999) (Title VII). To be sure, "the harassment must be more than the sort of teasing and bullying that generally takes place in schools." *Fennell*, 804 F.3d at 409 (quoting *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011)). But at bottom, all that is required is that the harassment "detracts from the victims' educational experience, [such] that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651.

B.W. clearly alleges facts that meet this prong. In his complaint, B.W. includes recurrent incidents of harassment that explicitly reference his race. He alleges that students repeatedly recited the "evils of the white race" to B.W.; that students ran into the locker room and proclaimed (with B.W. present) "here are all the white boys!"; and that students daily abused B.W. both physically and verbally. Worst of all, B.W. alleges that another student beat him bloody and then bragged to the school that he had done so "because B.W. was white." B.W. alleges that he was subjected to daily harassment from his classmates following that public pronouncement of racial animus. Adding insult to B.W.'s obvious physical injuries, much of the harassment came from *school teachers*.[4] B.W. avers that teachers and administrators continually made derogatory racial comments toward him.

_____

[4] The panel opinion disregarded B.W.'s allegations of harassment from school district employees, reasoning that B.W. had forfeited the argument that Title VI recognizes a cause of action for teacher-on-student harassment. However, B.W. does not need a second *cause of action* for us to take account of teacher-on-student harassment. In a Title VI claim, the ultimate question is whether the totality of the events created a "hostile environment" such that it deprived B.W. of equal educational benefit. *Sewell*, 974 F.3d at

Finally, and most importantly, the harassment plainly affected B.W.'s education. B.W. was forced to withdraw from Austin ISD. These allegations satisfy the requirement that the harassment "detract[] from the victim[']s educational experience." *Davis*, 526 U.S. at 651; *see also Sewell*, 974 F.3d at 585 (requiring that the harassment have a "concrete, negative effect" on the plaintiff's education).

The KKK meme is further evidence of race-based harassment. Groups like the KKK and the Nazis are white-supremacist organizations that generally have a racial association tied to membership. Thus, a meme depicting B.W. as a member of the KKK has a racial component, particularly in the context of the other overtly race-based harassment that B.W. alleges occurred here. When an individual is accused of membership in a politically odious organization associated with that individual's protected characteristic, such an accusation amounts to stereotyping based on that protected characteristic. Suppose instead that a student made a meme of an Afghan classmate as a member of the Taliban or Al Qaeda. Such a meme obviously implicates the student's protected characteristics. The perpetrator's statement that he made the meme because his "father told him not to be friends with anyone who was a Conservative" does not eliminate the KKK meme's racial aspects, especially when B.W. alleges that his

---

584. We have held that a teacher's conduct is relevant to that question. *See id.* at 581–82, 584–85 (concluding that actions taken by the school principal and dean of students were sufficient to plead a harassment claim at the motion-to-dismiss stage); *see also Est. of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 995 (5th Cir. 2014). For this reason, I account for the allegations that concern B.W.'s teachers and school administrators—including both their affirmative harassment of B.W. and failure to prevent harassment by other students—when considering whether the harassment at issue is actionable. At least one of our sister circuits has affirmed a Title VI judgment where school teachers were responsible for some of the harassment. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir. 2012) ("[I]n the educational setting, a school district is liable for intentional discrimination when it has been 'deliberately indifferent' to teacher or peer harassment of a student.").

harassment was based on a "broader stereotype" that encompassed both his race and his political beliefs. Taunting an individual as being a member of a loathsome group based upon that individual's race is race-based harassment, even if additional motivations are present.

Austin ISD and JUDGE RICHMAN's *en banc* concurrence contend that there are not enough incidents for the harassment to be considered "pervasive" over a two-and-a-half-year period. On the contrary, B.W. specifically alleges that he suffered *repeated* physical and verbal abuse. B.W. alleges that many of the incidents of racial harassment—such as a teaching aide pejoratively calling B.W. "Whitey"—were recurring incidents. In addition, B.W. alleges daily instances of name-calling, tripping, and vulgar language. Where a student alleges harassment explicitly referencing his race along with more generic instances of bullying, especially when those instances follow harassment expressly because of the student's race, it is reasonable to infer at the 12(b)(6) stage that the generic harassment is also motivated by racial animus. *Sewell*, 974 F.3d at 584 (at the pleading stage, plaintiff is entitled to racially charged characterization of a word that is race-neutral in some contexts); *Toy*, 714 F.3d at 883 ("We review dismissal under Rule 12(b)(6) *de novo*, 'accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff.'" (quoting *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)).

*Cicalese v. University of Texas Medical Branch* is instructive. 924 F.3d 762 (5th Cir. 2019). There, in the analogous Title VII context, we rejected the district court's 12(b)(6) dismissal of the complaint. *Id.* at 766, 768. The district court dismissed the case because it did not think that some of the plaintiffs' co-workers were "similarly situated" and because it thought that the alleged derogatory statements amounted to "stray remarks." *Id.* at 768. Our court held that such "rigorous factual or evidentiary analysis" "was more suited to the summary judgment phase." *Id.* at 767–68. Therefore

No. 22-50158

"[t]he district court erred by holding [Plaintiffs] to a heightened pleading standard." *Id.* at 768. So too here.

*     *     *

Taking the allegations in the complaint as true, B.W. was physically attacked and verbally abused because of his race. On top of this, B.W. was the victim of daily name-calling, tripping, and harassment that was, at least in part, based on race. At this stage, the allegations in B.W.'s complaint plausibly state a Title VI claim for race-based harassment. In ruling otherwise, half of our court would force B.W. to meet a higher pleading standard than any other litigant. *See id.* ("The district court erred by holding Appellants to a heightened pleading standard."). Instead, we should uphold long-settled precedent establishing that where the plaintiff pleads facts that even plausibly amount to a viable claim, he is permitted to continue his case and obtain discovery. For these reasons, I would reverse the dismissal of B.W.'s complaint for failure to state a claim and remand for further proceedings consistent with this opinion. As we must affirm the judgment because we are equally divided, I respectfully dissent from that affirmance.

No. 22-50158

## APPENDIX

### Summary of Incidents

| | Date | Event | Citation |
|---|---|---|---|
| 1. | Oct. 2017 | B.W. and classmates attend field trip to Enchanted Rock. B.W. wears a "MAGA" hat. Faculty and students begin to treat B.W. "poorly." | Fourth Am. Compl. ¶¶ 28, 29 |
| 2. | Oct. 2017 | B.W.'s father mentions to middle school counselor that students were treating B.W. poorly. Counselor responds that B.W.'s hat was "pretty inflammatory." | Fourth Am. Compl. ¶ 29 |
| 3. | Nov. 2017 | B.W.'s parents meet with middle school principal to discuss other incidents of students mistreating B.W. Principal promises future action, but none is taken. The incidents increase in severity. | Fourth Am. Compl. ¶¶ 30–32 |
| 4. | Jan. 2018 | B.W.'s parents meet with the middle school principal again. Future action is promised, but none is taken. | Fourth Am. Compl. ¶¶ 33–34 |
| 5. | Feb. 2018 | Middle school students stage a walkout to protest "gun violence." B.W. refuses to participate. One student tells B.W., "I'm gonna make you an 'I heart school shootings t-shirt.'" B.W.'s father speaks with the principal again, but no action is taken. | Fourth Am. Compl. ¶¶ 35–37 |

| | Date | Event | Citation |
|---|---|---|---|
| 6. | Spring 2018 | B.W.'s relationship with other students deteriorates. He begins to be "ostracized" for being white, Christian, a Republican, and a "Trump supporter" and harassed based on rumors he is a racist, "anti-feminist," and "anti-gay." | Fourth Am. Compl. ¶ 38 |
| 7. | Spring 2018 | A student makes fun of B.W. while in Latin class, saying, "Ah, Christians should understand Latin." | Fourth Am. Compl. ¶ 40 |
| 8. | Spring 2018 | Students make fun of B.W. while in band class, mocking his race and characterizing "the evils of the white race in American history." | Fourth Am. Compl. ¶ 41 |
| 9. | Spring 2018 | The middle school principal makes fun of B.W. while he is walking in the hall, "yank[s]" out his ear bud, laughs to herself, and states sarcastically, "Are you listening to Dixie?" Bullying from other students increases. | Fourth Am. Compl. ¶¶ 42–43 |
| 10. | Spring 2018 | A teacher says to B.W., "Man, I'm getting concerned about how many white people there are." | Fourth Am. Compl. ¶ 44 |
| 11. | Spring 2018 | Unprovoked, a student walks up to B.W. and says, "I don't like that you're forcing your religion on me." | Fourth Am. Compl. ¶ 45 |

No. 22-50158

| | Date | Event | Citation |
|---|---|---|---|
| 12. | Spring 2018 | An aide in B.W.'s math class repeatedly calls B.W. "Whitey." She speaks down to him, saying things like, "Can't figure this one out Whitey?" | Fourth Am. Compl. ¶ 46 |
| 13. | Spring 2018 | One student makes a meme of B.W. dressed as a hooded Ku Klux Klansman and circulates it to other students. B.W.'s father complains to the principal, but she takes no action. | Fourth Am. Compl. ¶¶ 48–51 |
| 14. | Spring 2018 | A teacher is "hostile" to B.W. while on a field trip. | Fourth Am. Compl. ¶ 52 |
| 15. | Apr. 2018 | B.W.'s parents write a letter to the middle school principal and associate superintendent of middle schools, complaining about the recent events. No action is taken. | Fourth Am. Compl. ¶¶ 53–56 |
| 16. | May 2018 | B.W. graduates middle school. "Many" students wear items or hats communicating "social messages." B.W. wears a "MAGA" hat to the graduation. A teacher ridicules B.W., saying, "Ya know, we're trying to create a safe environment here!" | Fourth Am. Compl. ¶¶ 57–58 |

No. 22-50158

| | Date | Event | Citation |
|---|---|---|---|
| 17. | June 2018 | The associate superintendent follows up with B.W.'s parents, saying that "an apology is extended for all uncomfortable and negative experiences B.W. felt." | Fourth Am. Compl. ¶ 63 |
| 18. | Sept. 2018 | B.W. begins high school. The student who made the meme of B.W. says to him, "You're dumber than I thought, the meme of you was a Nazi officer, not a Klansman." B.W.'s parents request and are granted a "Stay-Away Agreement" between B.W. and the student. | Fourth Am. Compl. ¶¶ 67–68 |
| 19. | Sept. 2018 | The student and his friends harass B.W. The student says to B.W. in front of other students, "So you really said that? Gay people don't exist?" | Fourth Am. Compl. ¶¶ 69–72 |
| 20. | Sept. 2018 | A student insults B.W. for wearing a Ted Cruz shirt. Other students kick him. | Fourth Am. Compl. ¶ 74 |
| 21. | Sept. 2018 | B.W.'s parents file a grievance. No action is taken. | Fourth Am. Compl. ¶ 70 |
| 22. | Oct. 2018 | B.W. asks to write an English paper on the Second Amendment. The class chants "School Shooter!" The teacher does nothing to stop the chanting. | Fourth Am. Compl. ¶ 78 |

| | Date | Event | Citation |
|---|---|---|---|
| 23. | Nov. 2018 | A teacher asks if anyone had any Halloween candy to offer. B.W. raises his hand, and the teacher responds, "Your candy would be filled with hate and oppression." | Fourth Am. Compl. ¶ 79 |
| 24. | Nov. 2018 | The school holds a conference to discuss B.W.'s parents' grievance. The high school assistant principal is assigned to investigate. | Fourth Am. Compl. ¶ 80 |
| 25. | Nov. 2018 | Students continue to harass B.W. One student asks "Why's he a homophobe?" and "Why's he a racist?" Other students call B.W. a "F—ing racist." | Fourth Am. Compl. ¶¶ 82–83 |
| 26. | Dec. 2018 | B.W.'s best friend tells him that he heard a rumor that B.W. is a "homophobe." | Fourth Am. Compl. ¶ 39 |
| 27. | Dec. 2018 | The school responds to the grievance filed by B.W.'s parents. It finds no harassment or bias by faculty. The school asks the student who made the meme of B.W. to sign another "Stay-Away Agreement." | Fourth Am. Compl. ¶¶ 84–85 |
| 28. | Dec. 2018 | B.W. and his friends discuss a girlfriend. A teacher tells B.W., "I will not have a white man talk to me about gender issues!" | Fourth Am. Compl. ¶ 87 |

No. 22-50158

| | Date | Event | Citation |
|---|---|---|---|
| 29. | Fall 2018 | B.W. stands to recite the Pledge of Allegiance. A student tells him, "America is only for white people." | Fourth Am. Compl. ¶ 88 |
| 30. | Jan. 2019 | B.W.'s parents file a second grievance, complaining of bullying by students and teachers. | Fourth Am. Compl. ¶ 90 |
| 31. | Feb. 2019 | Another student draws a swastika on the back of one of B.W.'s friends. He then states to B.W. that "I'm going to beat the s— out of you." He then punches B.W. repeatedly. The student tells others that he beat B.W. because he "was white." | Fourth Am. Compl. ¶¶ 92–96 |
| 32. | Feb. 2019 | The school investigates the incident and concludes that B.W. was not harassed or bullied. | Fourth Am. Compl. ¶ 98 |
| 33. | Spring 2019 | Students regularly call B.W. a racist, swear at him, and make obscene gestures at him. | Fourth Am. Compl. ¶ 102 |
| 34. | Summer 2019 | B.W.'s parents file an administrative appeal of the no-action taken in relation to their grievance. The Board, hearing the appeal, ratifies the school's decision and takes no action. | Fourth Am. Compl. ¶ 103–04, 106–09 |
| 35. | Fall 2019 | Daily, students call B.W. a racist, swear at him, make obscene gestures, and try to trip him. | Fourth Am. Compl. ¶ 111 |

No. 22-50158

|     | Date | Event | Citation |
| --- | --- | --- | --- |
| 36. | Fall 2019 | A teacher asks B.W. if he "enjoyed his White Gospel Music." | Fourth Am. Compl. ¶ 113 |
| 37. | Fall 2019 | A group of students say to B.W. and others, "here are all the white boys!" | Fourth Am. Compl. ¶ 114 |
| 38. | Spring 2020 | Students continue to harass B.W. on a regular basis. | Fourth Am. Compl. ¶ 116 |
| 39. | Mar. 2020 | A student, looking at B.W., says, "Oh my F—ing G-d, I'm going to kill all Trump supporters, I don't give a s— who hears it.  I want to kill all of them."  The school declines to investigate. | Fourth Am. Compl. ¶ 118–21 |

No. 22-50158

JAMES C. HO, *Circuit Judge*, joined by DUNCAN, *Circuit Judge*, dissenting:

I agree with Chief Judge Elrod that the allegations presented here state a viable claim of racial harassment under Title VI of the Civil Rights Act of 1964. Indeed, the allegations in this case are more substantial than in other cases where we have found racial harassment. *See*, *e.g.*, *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 434 (5th Cir. 2022); *see also id.* at 441–42 (Ho, J., concurring in part and dissenting in part).

The panel dismissed the case because it theorized that B.W. was bullied for political, not racial, reasons. But according to the allegations, B.W. was harassed for *both* racial and political reasons. As the panel noted, B.W. was "'harassed' for being racist" because he is "a supporter of former president Trump, white, and Christian." *B.W. v. Austin Ind. Sch. Dist.*, 2023 WL 128948, *1 (5th Cir.), *vacated on reh'g en banc*, 72 F.4th 93 (5th Cir. 2023).

So according to the complaint, B.W. was harassed on multiple occasions for multiple reasons—but being white was absolutely one of them.[1]

---

[1] Just consider the numerous allegations as described in the panel opinion. "[T]wo students repeatedly harassed B.W. for being Caucasian by repeating the evils of the white race in American history." *Id.* The president of the student council "created a meme of B.W. as a hooded Ku Klux Klansman." *Id.* Racial comments were also made by school officials in the presence of fellow students. "On one occasion, when B.W. was listening to music using his ear buds, Principal Malott 'yanked one ear bud out of his ear and stated sarcastically, "Are you listening to Dixie?"' Principal Malott then walked away laughing to herself, and other students witnessed the entire incident." *Id.* A teacher "told B.W. very loudly that she was 'getting concerned about how many white people there are.'" *Id.* A teaching aide "repeatedly called B.W. 'Whitey' and said, 'You need help Whitey?' or 'Can't figure this one out Whitey?' when he raised his hand." *Id.* Another teacher told B.W. that "I will not have a white man talk to me about gender issues!" *Id.* at *2.

Moreover, B.W. was not only verbally harassed, but also physically assaulted because of his race. A fellow student, I.L., told B.W. that "'I'm going to beat the [expletive] out of you.' The next thing B.W. remembers is that he was lying on the ground

No. 22-50158

It's racist to characterize whites as racist. Because it's racist to attach any negative trait to a group of people based on their race. And it's no less racist just because the victimized racial group is white.

\* \* \*

Federal law protects every American against racial discrimination—including whites.

The Fourteenth Amendment secures the privileges or immunities of every citizen and guarantees them due process of law and the equal protection of the laws—regardless of their race. U.S. Const. amend. XIV, § 1. Title VI mandates that "[n]o person . . . shall, on the ground of race, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. And Title VII makes it illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).

But it's one thing to have these laws on the books. It's another thing for courts to actually enforce them—and to enforce them for everyone, on equal terms, no matter how unpopular it may be in certain circles. *Cf.* Deuteronomy 1:17 ("Do not show partiality in judging; hear both small and great alike. Do not be afraid of anyone.").

For over a half century, courts failed to enforce the Fourteenth Amendment. From *Plessy v. Ferguson*, 163 U.S. 537 (1896), until *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954), the Supreme Court stood

---

bleeding after being struck multiple times. . . . B.W. later discovered that I.L. had told others that I.L. had assaulted B.W. because B.W. was white." *Id.* at *3.

A reasonable jury could easily conclude that B.W. was harassed because of his race.

by as states openly engaged in explicit racial segregation in public transportation and education. *See*, *e.g.*, *Gong Lum v. Rice*, 275 U.S. 78 (1927).

Then, for about another half century, from *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), until *Students for Fair Admissions v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), the Supreme Court repeatedly gave its official blessing to explicit racial classifications in student admission decisions made by public and private educational institutions nationwide, notwithstanding both the Fourteenth Amendment and Title VI. *See*, *e.g.*, *Grutter v. Bollinger*, 539 U.S. 306 (2003).

These are just the most infamous instances of judicial abdication when it comes to antidiscrimination law. They're hardly the only examples.

The Supreme Court's decision in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), states the governing test for establishing a prima facie case of racial discrimination under Title VII. It's one of the most frequently cited decisions interpreting Title VII.

Yet the first prong of the *McDonnell Douglas* test suggests that Title VII does not apply to whites. It asks if the plaintiff "belongs to a racial minority." *Id.* at 802.

To be sure, the Supreme Court has since made clear that Title VII "prohibit[s] discriminatory preference for *any* racial group, *minority* or *majority*." *McDonald v. Santa Fe Trail Transp.*, 427 U.S. 273, 279 (1976) (cleaned up). Title VII is supposed to "proscribe racial discrimination in private employment against whites *on the same terms* as racial discrimination against nonwhites." *Id.* (emphasis added).

Yet a surprising number of circuits still to this day deny whites "the same terms" of Title VII protection as members of other racial groups. *Id.*

No. 22-50158

The Supreme Court recently granted certiorari to decide whether "majority" group plaintiffs are subject to a stricter standard of proof under Title VII than members of "minority" groups. *See Ames v. Ohio Dep't of Youth Servs.*, _ U.S. _ (2024). The question presented in *Ames* is whether courts may require members of majority groups—and *only* members of majority groups, such as whites—to present special evidence of "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority," before they can prevail under Title VII. Pet. at 2.

Perhaps the Court granted certiorari in *Ames* because it should be obvious that whites are entitled to the same Title VII protections as members of any other racial group. But that only proves the point: The Court granted certiorari precisely because it's a question on which the circuits today are divided. *See*, *e.g.*, *Briggs v. Potter*, 463 F.3d 507, 517 (6th Cir. 2006) ("A reverse-discrimination claim carries a different and more difficult prima facie burden."). And notably, the discriminatory test adopted by various circuits originated from the discriminatory language of *McDonnell Douglas* that the Supreme Court supposedly interred decades ago. Various circuits justified the discriminatory treatment of white plaintiffs who bring Title VII suits by invoking *McDonnell Douglas*.[2]

---

[2] *See*, *e.g.*, *Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981) ("The original *McDonnell Douglas* standard required the plaintiff to show 'that he belongs to a racial minority.' Membership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated, for only in that context can it be stated as a general rule that the 'light of common experience' would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member. Whites are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society."); *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985).

No. 22-50158

\* \* \*

Our culture today increasingly accepts (if not celebrates) racism against whites.

Law professors teach that "angry white people" are "fearful of racial diversity," and that "white evangelicals" in particular are "waging war on democracy." Rena Steinzor, AMERICAN APOCALYPSE 1, 10 (2024). University students are told that there is a "cost of talking to white people . . . the cost of your own life, as they suck you dry," and that "[t]here are no good apples out there." Michael Levenson, *A Psychiatrist Invited to Yale Spoke of Fantasies of Shooting White People*, N.Y. TIMES, June 6, 2021. As one university lecturer put it, "[w]hite people make my blood boil." *Id.*

Writers and journalists proclaim that "'White America' is a syndicate arrayed to protect its exclusive power to dominate and control our bodies." Ta-Nehisi Coates, *Letter to My Son*, THE ATLANTIC, July 4, 2015. "White identity is inherently racist," and "white people do not exist outside the system of white supremacy." Robin DiAngelo, WHITE FRAGILITY 149 (2018). "Racist ideas make [w]hite people think more of themselves, which further attracts them to racist ideas." Ibram X. Kendi, HOW TO BE AN ANTI-RACIST 6 (2019). "[T]he white race is the biggest murderer, rapist, pillager, and thief of the modern world." Jordan Boyd, *In Racist Screed, NYT's 1619 Project Founder Calls 'White Race' 'Barbaric Devils,' 'Bloodsuckers,' Columbus 'No Different Than Hitler'*, THE FEDERALIST, June 25, 2020. *See also* Christopher F. Rufo, AMERICA'S CULTURAL REVOLUTION (2023) (government agencies and corporations teach that "all white people" are racist and America is a "white supremacy system"); Heather Mac Donald, WHEN RACE TRUMPS MERIT (2023); Barton Swaim, *How 'Antiracism' Becomes Antisemitism*, WALL ST. J., Dec. 29,

2023; Jeremy Carl, THE UNPROTECTED CLASS: HOW ANTI-WHITE RACISM IS TEARING AMERICA APART (2024).

So it's not surprising that more institutions increasingly believe that they have cultural permission to tolerate (if not encourage) racism against whites, under the guise of promoting diversity. Racism is now edgy and exciting—so long as it's against whites.

But cultural permission is not Congressional permission. Federal laws like Title VI prohibit discrimination on the basis of race. So it may be politically correct in certain circles to discriminate against whites. But politically correct does not mean legally correct.

It's unlawful under Title VI to discriminate against anyone—*anyone*—because of their race. So it is the solemn responsibility of the federal judiciary to stop institutions from using "diversity . . . as a license to discriminate." *Price v. Valvoline*, 88 F.4th 1062, 1068–69 (5th Cir. 2023) (Ho, J., concurring in the judgment). *See also*, *e.g.*, *Hamilton v. Dallas County*, 79 F.4th 494, 509 (5th Cir. 2023) (Ho, J., concurring).

I respectfully dissent.